Maudie P. **BLIZZARD,** Plaintiff,

v.

**NEWPORT NEWS REDEVELOPMENT AND HOUSING AUTHORITY,** Defendant.

**Civ. A. No. 82–167–NN.**

United States District Court, E.D. Virginia, Newport News Division.

April 12, 1984.

## OPINION AND ORDER

DOUMAR, District Judge.

The plaintiff brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* She alleges that the defendant terminated her employment in retaliation for filing a complaint of racial discrimination with the Equal Employment Opportunity Commission (EEOC) and for opposing an allegedly unlawful discriminatory employment practice. On August 12, 1983, the Court granted the plaintiff's motion to bifurcate the trial. A trial without a jury on the issue of liability alone took place on September 1 and 2, 1983. Following the presentation of evidence, the Court instructed the parties to brief the Court. The matter is now ready for decision. For the reasons stated herein, judgment shall be entered in favor of the plaintiff on the issue of defendant's liability under Title VII of the Civil Rights Act.

## I. FACTS

The plaintiff, Maudie P. Blizzard, is a black female and a resident of Hampton, Virginia. The defendant, Newport News Redevelopment and Housing Authority (hereinafter "Authority"), is a public agency responsible for developing and maintaining subsidized housing, housing for the elderly, and other residential projects. The Authority employs approximately 150 individuals, and receives most of its funds from the federal government.[1]

The plaintiff went to work for the Authority in 1953 as a management aid and was employed until 1955, at which time she left to pursue a nursing career. In 1963, she returned to work at the Authority as a project manager. As one of three project managers, she was responsible for supervising the operation of two apartment complexes in Newport News. The plaintiff's duties included insuring the grounds were kept clean, collecting rents, placing tenants and enforcing the leases. Since 1972, her immediate supervisor was Earl E. Allen, the Authority's Housing Management Officer.

The record demonstrates that the plaintiff's relationship with the Authority during the 1960's was good. Although instances of management disapproval of the plaintiff's judgment occurred with increasing frequency during the 1970's, she continued to receive good to outstanding merit ratings. As time passed, however, relations between the plaintiff and the Authority began to break down. The plaintiff was quite proficient at collecting rent but was often overzealous. Allen received complaints that the plaintiff was rude and abrupt toward tenants, and on occasion improperly threatened to evict those who questioned her authority. Eugene Lamb, the Authority's Director of Housing Management, reported that "Mrs. Blizzard has a quick temper and when someone questions her authority she flies off the handle."[2]

One source of unending friction with the Authority was a reluctance on the part of the plaintiff to perform any of the responsibilities of her job after 5:00 p.m. On January 31 and again on February 4, 1978, Newport News policemen attempted to reach the plaintiff by phone to report that an alarm had been activated. On the first occasion, the plaintiff asked a maintenance employee to take care of the alarm, contrary to Authority policy. On the second occasion, the plaintiff did not answer her phone under circumstances which led Allen to conclude that the plaintiff was not answering her phone because she did not want to be inconvenienced. The record contains evidence of other instances where the plaintiff either failed to respond to or failed to follow up phone calls at home.[3]

---

1. Of the 160 individuals employed by the Authority, over 60% are black, and over 20% of the Authority's management personnel are black.

2. The plaintiff's hostility toward those who questioned her authority was noted as early as 1972 and 1973. *See* Defendant's Exhibits 1 and 13.

3. A security officer reported one such incident to Allen:

 During my investigation of the vandalizing of a new exterior light in Harbor Homes I ques-

On the evening of April 5, 1978, a break-in occurred at a unit in one of the plaintiff's apartment complexes. Newport News police officers apprehended a suspect in the building and attempted to contact the plaintiff. In contravention of Authority regulations, the plaintiff did not respond to the police call for assistance. Instead, after directing them to call someone else, she apparently disconnected her phone and, thus, could not be reached. As a result of this incident and others, the plaintiff was suspended for three days without pay. She appealed the disciplinary action within the Authority, claiming that she was a sound sleeper and was not alert enough to follow through. The appeal was denied at all levels.

Prior to and following the April, 1978 incident, the plaintiff desired a better position within the Authority. In 1975, she applied for a position as Rehabilitation Officer but her application was denied. In June, 1976, the Authority turned down the plaintiff's application for a position as Occupancy Supervisor. In August, 1978, the plaintiff inquired whether the position as Equal Opportunity Officer was available. She claims that the Authority never got back to her with an answer. The plaintiff complains that during this time period a position as Personnel Technician became available but she was never informed of the opening.

On October 2, 1978, the plaintiff received her annual merit rating report from the Authority. In contrast to prior years, the rating in many categories was unsatisfactorily low. The comments of the plaintiff's supervisors accompanying the report pointed out the April break-in incident. Allen noted with approval the plaintiff's superior performance in the area of job performance, and attributed the apparent inconsistencies in the report to the April break-in incident and the plaintiff's illness during part of the rating period. Finally, the comments noted the plaintiff's increased inability to get along with others, especially her supervisors. In a letter to Allen, dated October 3, 1978, the plaintiff voiced her disappointment with the report and argued that the low merit rating was undeserved. She wrote that her evaluation should be based on her work during the forty hour week, not on her "off-duty time at home."

On November 2, 1978, the plaintiff filed a charge of racial discrimination with the EEOC. She complained that she had been continuously denied promotion and training by the Authority's refusal to post vacancies until after they were filled with less qualified white applicants. Specifically, the plaintiff alleged that Nancy Tobin, a white employee, was promoted to Personnel Technician and Art Morabito, also a white employee, was promoted to Personnel Officer, and that these positions were filled by word-of-mouth, thereby precluding the plaintiff from applying. Shortly thereafter, the Authority was notified of the EEOC complaint. The Authority's Equal Opportunity Officer, David G. Hay, contacted the plaintiff and informed her that his services were available if she would like to discuss the EEOC complaint. The plaintiff declined, preferring to await EEOC resolution. Hay's investigation of the complaint found that the position as Personnel Technician was posted but the plaintiff never applied for it. Moreover, the salary would have been lower for the plaintiff. Hay also found that a position as Personnel Officer never became available.

On March 12, 1979, the plaintiff wrote a letter to the EEOC complaining that she was being harassed and intimidated by her superiors. On March 26, she amended her EEOC complaint to incorporate the charge

---

tioned Mrs. Hester Gray, 1535–A Jefferson Avenue. While questioning Mrs. Gray it came to light that on December 13, 1977 her home had been burglarized. I asked her if she notified the police and the project manager. She stated she did, but when she spoke with Mrs. Blizzard, Mrs. Blizzard is supposed to have said "What do you want me to do about it?" To which Mrs. Gray is supposed to have said, "nothing, policy says I'm supposed to report these matters to you." Mrs. Blizzard is alleged to have said, "okay, you've reported it," and hung up.

I did not receive a manager's report of this incident and today is the first I've heard of the burglary.

Defendant's Ex. 30.

of unlawful retaliation. Specifically, the plaintiff alleged that Lamb, Allen and A.H. Hughes, Director of Management, were conspiring to force the plaintiff into an act of insubordination so that they would have cause to fire her. She also claimed that her superiors transferred her assistant, Beverly Lee, to prevent her from reaching her goals.

The relationship between the plaintiff and her employer continued to deteriorate through the remainder of 1979. Allen's file memoranda show that he was finding it increasingly difficult to work with the plaintiff. During this time, according to the plaintiff, the Authority forced her to report to work earlier than she was previously required. The Authority claims that this action was a specific response to the problem of cars parking on the lawn at one of her apartment complexes. The record shows that any personnel who were required to report to work early because of this problem could leave work at 4:00 p.m. rather than 5:00 p.m. At trial, Hughes and Allen testified that they did not have knowledge of either EEOC charge at this time.

On December 18, 1979, the Authority released the plaintiff's annual merit rating report. Once again, she received high ratings in the area of job performance and was given highly complimentary comments concerning her knowledge of the job, ability to collect rent, and complete routine administrative tasks. The plaintiff, however, received below average ratings in the areas of attitude and human relations. Mr. Allen reported that "Ms. Blizzard finds it difficult to accept criticism and/or direction, feeling it implies ineffectiveness (which is not the usual case), resulting in a seemingly [sic] attitude of hostility." He noted the difficulty the hostility caused in day-to-day operations.

The plaintiff responded to the report with a letter dated December 19, 1979

wherein she requested an appeal of the evaluation and bitterly resented the ratings and comments of Mr. Allen. One sentence in this letter became a catalyst for the substance of this Title VII suit. The plaintiff stated: "And because I filed a claim with EEOC September, 1978, I have been harassed, humiliated and intimidated by my superiors since that time."

On January 2, 1980, the evaluation was affirmed by Allen. On January 17, 1980, it was affirmed by Hughes. Finally, Lamb affirmed the recommendation on January 25, 1980.

Ordinarily, the affirmance by Lamb would have been the end of the appeals process and the matter would have ended, but Hughes had become alarmed about the plaintiff's charge of "harassment, humiliation and intimidation" and had begun an investigation. In a January 4, 1980 letter to Allen, Hughes characterized the charges as serious and stated that the plaintiff should give a "full and complete explanation." He set forth a list of questions which he wanted answered.[4] During the evaluation appeal conference with the plaintiff, Hughes stated that the harassment issue was outside the perimeter of the appeal, and that he would recommend to Lamb that an investigation take place.

During the Appeal Conference held on January 23 with the plaintiff, Lamb apparently did not consider the harrassment charge to be outside the perimeter of the appeal. The allegation became a focal point of the conference. Lamb stated that "this is a very serious charge" and asked for some information. The plaintiff only stated that Allen "applied his personal feelings" to the evaluation. Otherwise, she refused to comment except to say "I realize that that was another subject altogether. At the time I was writing that, I was disturbed, and I realize it was not appropriate to insert that." After refusing to say

---

**4.** Specifically, Hughes wanted Allen to pose the following questions to the plaintiff:
1. What incidents took place which caused harrassment, humiliation, and intimidation?
2. When did these incidents occur?
3. Where did these incidents take place?

4. Were there any witnesses to any one or all of these incidents?
5. Who were the principal parties to these incidents?
6. Why, in Mrs. Blizzard's opinion, did these incidents take place?

anything further, the discussion turned to the low merit ratings.

On the same day, Lamb informed David Hay of the harassment charge and instructed him to investigate. Hay contacted Hughes, Lamb and Allen concerning the charges and met with the plaintiff. Allen stated that he never knew the plaintiff filed a retaliation claim. At the conclusion of his investigation, Hay reported on February 5, 1980, that the harrassment charge was without substance and Allen's low ratings were supported by specific evidence.

On February 6, 1980, a meeting was held which provided the basis for this suit. Lamb and the plaintiff were present. The substance of the meeting is contained in a letter dated February 7, 1980 from Lamb and sent to the plaintiff via registered certified mail. The letter states:

> In pursuing your appeal in connection with your evaluation by Mr. Allen, you stated that you had been "harassed, humiliated and intimidated". When I reviewed the evaluation with you on January 23, 1980 I advised you that I was disturbed since this was a serious charge against members of my staff and I was going to have the matter fully investigated. At that time, you said that "I realize that that was another subject altogether. At the time I was writing that, I was disturbed and I realize it was not appropriate to insert that."
>
> Mr. Hay investigated this charge and reported to me on February 5, 1980 that he found no evidence of harassment, humiliation or intimidation because of you filing an EEOC charge.
>
> On February 6, 1980, I advised you of Mr. Hay's findings and asked again for some evidence of harassment, humiliation or intimidation by your superiors and told you that if you had none, you would have an opportunity to retract this charge by 10:00 a.m., February 7, 1980. You have seen fit not to give me any evidence. You have failed to retract, and in view of this, I am terminating your employment because I am of the opinion this action is in the best interest of the Authority.

On February 8, 1980, the plaintiff amended her complaint with the EEOC, complaining that she had been unlawfully discharged from her employment in retaliation for filing a charge of discrimination with the EEOC. After receiving a Notice of Right to Sue letter from the EEOC, the plaintiff brought this suit.

## II. TITLE VII

In enacting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, Congress sought to eliminate discrimination in employment based on race, color, religion, sex or national origin. Section 704(a) of the Act embodies Congressional concern that the purpose of the Act could be frustrated if complaining employees were not given protection from retaliatory tactics by employers. *Cassidy v. Virginia Carolina Veneer Corp.*, 652 F.2d 380, 382 (4th Cir.1981). Section 704(a) provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e–3(a).

The Courts have construed this section liberally, reasoning that Congress intended broad protection for those who protest unlawful employment practices. *E.g., Rutherford v. American Bank of Commerce*, 565 F.2d 1162 (10th Cir.1977); *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 11 A.L.R.Fed. 302, *reh'g denied*, 415 F.2d 1376 (5th Cir.1969).

■ In a title VII case, the ultimate burden of persuasion always remains on the plaintiff but the burden of production shifts. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978). First, the plaintiff must establish a prima facie case of dis-

crimination. In the context of Title VII, the Supreme Court has made clear that "prima facie case" means establishing "a legally mandatory, rebuttable presumption". *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 7, 101 S.Ct. 1089, 1094 n. 7, 67 L.Ed.2d 207 (1981). Second, once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that there exists a legitimate, nondiscriminatory reason for the presumptively discriminatory action. The explanation must be "legally sufficient to justify a judgment for the defendant." *Id.* at 255, 101 S.Ct. at 1094.

At the third and final stage of the order of proof, the plaintiff's case has been rebutted and she then must have "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* at 256, 101 S.Ct. at 1095. At this point, the plaintiff's burden merges into her ultimate burden of persuading the trier of fact that she is the victim of conduct proscribed by Title VII. *Id.*

■ The three-part allocation of the burden of proof articulated in *McDonnell Douglas* and *Burdine* applies with equal force in retaliation suits. *E.g., Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir.1982); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). Establishing a prima facie case of retaliation requires the plaintiff to prove (1) she participated in a Title VII proceeding or opposed a practice made unlawful by Title VII, (2) the employer knew of the employee's participation or opposition, (3) the employee suffered adverse employment treatment following the participation or op-

position, and (4) a causal connection between the adverse employment treatment and the participation or opposition. *Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d at 343; *Cazalas v. United States Dept. of Justice*, 569 F.Supp. 213, 231 (E.D.La.1983); *see Grant v. Bethlehem Steel Corp.*, 622 F.2d at 46 (describing causal connection as "a retaliatory motive playing a part in the adverse employment actions").

### A. The Opposition Clause

■ The literal terms of the statute provide that the plaintiff may establish the first of the four elements of a prima facie retaliation case by either one of two ways; by showing that she opposed an employment practice made unlawful by Title VII, or by showing that she participated in an EEOC proceeding. *See* 42 U.S.C. § 2000e–3(a). Also under the literal terms of the statute, in order to satisfy the opposition clause, it appears the plaintiff must show that an "unlawful employment practice" in fact existed. *See Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978) (arguably, protection of opposition clause only applies if unlawful practice exists). Reasoning that a literal interpretation of the clause would encourage employees to file EEOC complaints rather than seek conciliation of their grievances, the overwhelming majority of courts, including all circuit courts which have addressed the issue, have only required the charge to be based on reasonable belief.[5] *E.g., EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.1983); *Payne v. McLemore's Wholesale and Retail Stores*, 654 F.2d

---

**5.** The Authority cites *Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir.1978) in support of its position that the plaintiff must prove the activity of which she complained was both legally and factually unlawful. The *Silver* case, however, addressed an alleged retaliatory discharge following the plaintiff's opposition to discriminatory conduct on the part of a fellow *employee*. The Court determined that under these circumstances, no unlawful employment practice by an employer was shown, as the Act requires. *Id.* at 141, *see* 42 U.S.C. § 2000e–3(a). In fact, the court noted that the plaintiff did not even contend that the conduct of the employee could be

imputed to the employer. The *Silver* court held that Title VII was not even applicable, and thus did not reach the issue the defendant seeks support for here. 586 F.2d at 141, 141 n. 4. The Ninth Circuit Court of Appeals subsequently addressed the issue in authoritative fashion, holding that an employee's opposition is protected if it is based on a reasonable belief that the employer's conduct was unlawful. *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir.1983). The *Crown Zellerbach* court clearly distinguished the holding in *Silver*. 720 F.2d at 1013–14.

1130, 1140 (5th Cir.1981); *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C.Cir.1981). *But see EEOC v. C & D Sportswear Corp.*, 398 F.Supp. 300, 306 (M.D.Ga.1975); *Winsey v. Pace College*, 394 F.Supp. 1324, 1329-31 (S.D.N.Y.1975). The Fourth Circuit Court of Appeals has not had an occasion to rule on the precise issue. *Cf. Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citing cases utilizing the reasonable belief standard).

The Court finds that the plaintiff need only show a reasonable belief that the employer was engaged in conduct proscribed by Title VII to fall within the protection of the opposition clause. To hold otherwise would have the practical effect of forcing employees to seek the protection of the participation clause, thereby increasing the number of EEOC complaints. Guarding against discrimination on the job would become more costly and less effective. Moreover, forcing employees to file complaints rather than seek internal grievance resolution only serves to exacerbate hostile feelings in the workplace. As stated by the fifth circuit, "[t]he resolution of such [discrimination] charges without governmental prodding should be encouraged." *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d at 1138.

#### B. *The Participation Clause*

■ Unlike the opposition clause, the participation clause in 42 U.S.C. § 2000e–3(a) grants an absolute privilege for filing a claim with the EEOC. There is no requirement in the statute that the discrimination claim be meritorious, and the courts have not imposed such a limitation. *E.g., Pettway v. American Cast Iron Pipe Co.*, 411 F.2d at 1007; *EEOC v. Virginia Carolina Veneer Corp.*, 495 F.Supp. 775, 778 (W.D. Va.1980), *appeal dismissed*, 652 F.2d 380 (4th Cir.1981); *Hearth v. Metropolitan Transit Comm'n*, 436 F.Supp. 685, 687 (D.Minn.1977). The filing of a claim with the EEOC is a protected right, the exercise of which cannot be infringed by the employer. *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d at 1007; *Held v. Missouri Pacific R.R. Co.*, 373 F.Supp. 996,

1001 (S.D.Tex.1974). It is likewise clear that an employee cannot be forced to participate in the employer's own investigation of the charges once the EEOC complaint is filed. *Pettway v. American Cast Iron Pipe Co.*, 441 F.2d at 1007-08.

### III. THE PLAINTIFF'S PRIMA FACIE CASE

#### A. *The Opposition Clause Claim*

■ The plaintiff claims that she is entitled to the protection of both the opposition and the participation clause. The opposition clause claim requires the plaintiff to show (1) she opposed a practice made unlawful by Title VII, (2) the Authority knew of her opposition, (3) she suffered adverse employment treatment following the opposition, and (4) a causal connection existed between the adverse treatment and the opposition. *Burrus v. United Telephone Co. of Kansas, Inc., supra.* It is undisputed that the plaintiff opposed an Authority "practice", that the Authority knew of her opposition, and that she was discharged from her employment. The only disputed issues are whether the plaintiff had a reasonable belief that the Authority's conduct was unlawful, and whether the necessary causal connection existed. The Court need not reach the second issue at this time.

■ It is only the reasonableness of the statement in the plaintiff's evaluation appeal that is relevant for purposes of the opposition clause. The statements made in the initial and amended EEOC complaint receive the absolute protection of the participation clause. However, an evaluation of these statements and the circumstances surrounding the filing of the original and amended EEOC complaint is necessary in order to assess the reasonableness of the plaintiff's subsequent belief that the Authority was retaliating against her. The evidence indicates and the Court finds that the plaintiff's supervisors had a great deal of respect for her ability to get the job done. Without question, she had the ability to collect rent and enforce leases. It was only her lack of interpersonal skills and poor attitude that caused problems

with tenants and her supervisors. The Court observed the demeanor of the plaintiff and her supervisors on the witness stand and has reviewed all the documents in this matter. The evidence shows that the parties had a productive working relationship for fifteen years. Sometime during the 1970's this relationship began to deteriorate. At the same time, the plaintiff began to look and apply for other positions within the Authority. Although the plaintiff claims that the Authority's refusal to hire her for these positions was discriminatory, the evidence shows that these positions were not advancements within the Authority but lateral moves. The investigation by Hay revealed that the plaintiff did not even apply for one of the positions listed on her EEOC complaint and the other was not an opening at all. More importantly, the plaintiff simply was not qualified for these positions and, in fact, some of these positions demanded the very skills which were found to be deficient in the plaintiff—human relations and attitude.

The April, 1978 break-in incident deepened the rift between the plaintiff and the Authority. This incident led directly to the poor merit rating for the year which, in turn, was immediately followed by the filing of the EEOC complaint. After fifteen years of receiving good merit ratings, the plaintiff reacted to her first poor rating by charging her employer with discrimination. Not only were the claims in the EEOC complaint completely unfounded as noted, there simply was no evidence to support a belief of discrimination.

The plaintiff argues that the Authority's attitude toward her suddenly changed sometime in 1978, but she does not explain why the attitude change occurred and there certainly is no evidence as to why the Authority would suddenly become discriminatory after fifteen years.

The claim of retaliation was likewise without basis. The plaintiff stresses how the form of communication with Allen changed after she filed the EEOC complaint from oral messages to written messages. The Court is at a loss to find how this action constitutes retaliation. The relationship between the plaintiff and the Authority was rapidly deteriorating at this point and, as Allen testified, a different form of communication was necessary to make the plaintiff more responsive. The plaintiff complains that she was forced to report to work at 7:00 a.m. instead of 8:00 a.m. as she had previously, but the record shows that all personnel forced to report early could leave work an hour earlier. Moreover, the time change was temporary and necessitated by the problems of cars parking on the lawn at one of the projects. Most of the plaintiff's remaining complaints concerning retaliation simply show hostility toward the Authority. From the exhibits and the oral testimony, the Court finds that the situation had reached the point where the plaintiff could no longer accept orders from her superiors and she used the EEOC complaint to justify her intolerance toward her superiors.

The purpose of this inquiry into the facts leading up to the charge of retaliation in the plaintiff's evaluation appeal is not to show that the claims within the EEOC complaint were unfounded. That issue has no relevance to this entire proceeding. The point to be made is that on December 19, 1979, when the plaintiff wrote in a letter that she was being harassed and intimidated because she filed an EEOC claim, no reasonable basis for the belief existed. Based on this factual finding, the plaintiff has failed to set forth a prima facie case of retaliation for opposing a practice made unlawful by Title VII.

### B. *The Participation Clause Claim*

At the time of her discharge, the plaintiff had "participated" in a Title VII proceeding. Indeed, the plaintiff had made a charge which contained claims of discrimination and retaliation. Accordingly, it is undisputed that (1) the plaintiff participated in a Title VII proceeding, (2) the authority knew of her participation, and (3) the plaintiff suffered adverse employment treatment, that is, she was discharged. The only remaining element necessary to establish a prima facie case is the causal connection between the adverse treatment and the participation. Courts have held

that this element can be established by showing circumstances from which a retaliatory motive can be inferred, such as adverse action following immediately after protected activity. *E.g., Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d at 343; *Grant v. Bethlehem Steel Corp.*, 622 F.2d at 46.

■ In the present case, the letter of February 7, 1980 from Lamb to the plaintiff, incorporating the substance of the previous day's conference, directly evidences the causal connection. Lamb stated: "You have failed to retract, and in view of this, I am terminating your employment...."[6] It is difficult to imagine how the causal connection could be more directly proved. Thus, the plaintiff has demonstrated a prima facie case of retaliation in contravention of 42 U.S.C. § 2000e–3(a).

The defendant argues that the plaintiff was terminated more than a year after the initial EEOC claim was filed, and almost eleven months after the claim of retaliation was filed. According to the Authority, this significant span of time defies a causal relationship between participation and termination, and thus the plaintiff has failed to set forth a prima facie case. In support of this argument, the Authority notes that the first EEOC complaint followed the poor merit rating report, and that Allen did not know of the retaliation claim until Hay's investigation in January of 1980. The defendant further claims that, from a management perspective, the Authority had ample cause to fire the plaintiff long before the February, 1980 meeting with Lamb, and never did so.

There is no question in the Court's mind that the Authority could have fired the plaintiff any time following the initial filing of the EEOC complaint, and could have done so for legitimate, nondiscriminatory reasons. The plaintiff's poor attitude toward her superiors and those who infringed upon her authority frustrated the defendant's ability to perform the tasks of a housing authority. She was not a part of the management team. Instead, she was

another source of problems for management. But the fact remains that the Authority did not terminate her. For whatever reason, the Authority attempted to salvage a sinking ship. Indeed, Lamb's letter of February 7, 1980 reveals that the Authority would have continued to tolerate the problems created by the plaintiff if she would just retract the charge of "harassment, humiliation and intimidation." It was because the plaintiff did not retract in the time allotted that the Authority decided upon a different course of action, that is, they would do without her. At that time, Lamb knew the plaintiff had filed claims of discrimination and retaliation with the EEOC. Thus, the fact of her termination under the circumstances announced in the letter established a prima facie case of discrimination. It is now the defendant's burden to establish a legitimate reason for the discharge. *McDonnell Douglas Corp. v. Green, supra.*

## IV. THE DEFENDANT'S BURDEN OF PRODUCTION

The *McDonnell Douglas* three-part order of proof requires that the defendant put forth evidence to rebut the plaintiff's prima facie case. The defendant sought to meet this burden by divorcing the charge of retaliation in the merit rating appeal from the EEOC charge. The defendant argues that the plaintiff made a charge of retaliation in her December 19, 1979 evaluation appeal, and this was the charge that Lamb wanted retracted. Without a retraction or some evidence that the substance of the claim was accurate, according to the Authority, the plaintiff presented a continuing management problem. In other words, the working relationship between the plaintiff and the Authority had broken down to the point where work could not go on without a resolution to the dispute.

■ The defendant's burden is to produce sufficient evidence of a legitimate, nondiscriminatory reason for its actions to sustain a judgment in its favor. *Texas*

---

**6.** The plaintiff essentially had three choices; she could (1) put forth evidence of retaliation; (2) retract the retaliation charge; or (3) accept termination.

*Dept. of Community Affairs v. Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. The Court finds that the Authority has not met this test. Prior to the February 6 conference between the plaintiff and Lamb, the plaintiff had already admitted that she should not have inserted the retaliation charge in the evaluation appeal, and that she had only done it at that time because she was upset about the merit rating. If the Authority was only interested in resolving the charge in the evaluation appeal, it is not clear what further purpose would be served by demanding that the plaintiff put forth evidence or retract. The plaintiff was within her rights not to disclose any evidence she might have regarding the EEOC claim, *Pettway v. American Cast Iron Pipe Co.,* 411 F.2d at 1007, and by demanding the plaintiff to produce or retract after she admitted she should not have made the charge in the evaluation appeal, the Authority transgressed the plaintiff's rights under Title VII. As stated previously, the Authority had every right to terminate the plaintiff for management reasons but they instead terminated her because she failed to do what she had a right not to do.

## V. THE PLAINTIFF'S ULTIMATE BURDEN OF PERSUASION

 Assuming that the Authority produced sufficient evidence to support a judgment in its favor, the plaintiff carried her burden of proving that the management concerns were just a pretext and her burden of ultimately persuading the Court that the Authority unlawfully retaliated against her. The key to this third part of the *McDonnell Douglas* order of proof was the Authority's intent in asking the plaintiff to "retract". When asked at trial how a retraction would help the management problem, Lamb could only answer that it would have been a "first step." He was not able to articulate what else it could have accomplished. Knowing the plaintiff as well as he did, the Court does not believe that Lamb expected a retraction to cure the plaintiff's attitude or human relations problems. The evidence is clear that Lamb wanted a retraction of the merits of the

plaintiff's claim of retaliation. The plaintiff did not have to do so. She was protected by Title VII and, therefore, the subsequent termination for failing to retract constituted unlawful retaliation. 42 U.S.C. § 2000e–3(a).

Accordingly, the Court ORDERS that judgment in this matter on the issue of liability be entered in favor of the plaintiff.

It is further ORDERED, pursuant to the Court's order of August 12, 1983, that this matter be REFERRED pursuant to Federal Rules of Civil Procedure Rule 53 to a Special Master.

It is further ORDERED that the parties shall attempt to agree on a Special Master and if they are unable to so agree within twenty (20) days of this order, each party shall submit the names of five prospective Special Masters to the Court within the said twenty (20) days. The Court will then select a Special Master from the common names on the two lists, and if there are no common names, the Court shall select a Special Master.

IT IS SO ORDERED.