Carla CAMPBELL, Plaintiff,

v.

BOARD OF REGENTS OF the STATE OF KANSAS; Kansas State University; Charles Deyoe; and June Bishop, Defendants.

Civ. A. No. 88–1710–T.

United States District Court, D. Kansas.

Aug. 9, 1991.

Donna J. Long, Ryan and Ryan, P.A., Clay Center, Kan., for plaintiff.

Dorothy L. Thompson, Kansas State University, Manhattan, Kan., for defendants.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on the motion of defendants for summary judgment. (Doc. 24). The action is brought under Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e, *et seq.*, 42 U.S.C. § 1983, and state common law. Plaintiff alleges sexual harassment, retaliation, constructive discharge, as well as a due process violation.

## I. *Background*

The material facts are undisputed unless otherwise noted. The dispute arises out of plaintiff's employment as an Administrative Assistant in the Department of Grain Science at Kansas State University. By a one-year contract, plaintiff's appointment to this position became effective on June 10, 1986. Before the expiration of this term, plaintiff signed a second contract covering the period from June 18, 1987 through June 17, 1988.

On February 18, 1988, plaintiff brought a complaint of sexual harassment to Walter Woods, Dean of the College of Agriculture. A meeting was held on this date, attended by plaintiff's attorney and Dick Seaton—the University Attorney—at which plaintiff outlined the following claims:

(1) that her supervisor—Dr. Charles Deyoe, Head of the Department of Grain Science—slapped her on the butt on December 22, 1987, and that this incident took place in Room 03K Shellenberger Hall after plaintiff had called Dr. Deyoe out of a meeting to deliver a message. Plaintiff stated that at the time she said to Dr. Deyoe: "If you don't do that again, I won't tell your wife;"

(2) that Dr. Deyoe had told plaintiff several times prior to December 22, 1987 that he would slap her on the butt;

(3) that plaintiff told Deanna Selby, a coworker, of the incident of December 22 on the same day, stating to her: "Dr. Deyoe has lost his mind. I'm going home; he hit me on the butt;"

(4) that plaintiff also told June Bishop, Office Supervisor in the Department of Grain Science and Industry, of the incident the day after it occurred;

(5) that in January 1988, Dr. Deyoe said that he would hit plaintiff again but obviously she does not like it;

(6) that plaintiff felt like Dr. Deyoe "treated her like a piece of meat;"

(7) that Dr. Deyoe crowded plaintiff in her office space and made knee to knee contact in his office, and further that this made her feel uncomfortable, but that she had not observed any inappropriate actions by Dr. Deyoe with other employees;

(8) that Dr. Deyoe had used obscenities in talking to plaintiff about others; and

(9) that Dr. Deyoe had not used any other inappropriate language or made other suggestive approaches.

A dispute exists regarding whether and at what time plaintiff told other employees in the Agriculture Department about the December 22 incident. Plaintiff alleges that she told Deanna Selby of the incident on the same day and told June Bishop the following day.

To investigate plaintiff's claims, Dean Woods met with Dr. Deyoe, informed him of the charges against him, and gave him an opportunity to respond. Dean Woods also talked to Deanna Selby, June Bishop, and Dr. Keith Behnke regarding the December 22 incident. The findings and conclusions of Dean Woods were stated in a letter of administrative resolution dated March 23, 1988 and sent to both plaintiff and Dr. Deyoe. (Eht. 10 to Defendant's motion in support). Among his findings were that:

(1) Dr. Deyoe generally denied plaintiff's allegations.

(2) Ms. Bishop and Ms. Selby stated that plaintiff made no mention on or about December 22, 1987 of the incident with Dr. Deyoe. Rather, these persons recall plaintiff telling them at different times. (Defendants' statement of facts, ¶ 8; Plaintiff's statement of facts, ¶ 8).

(3) Ms. Bishop stated that in mid-January of 1988, plaintiff became very angry in her presence because another employee was receiving tuition assistance from the Grain Science Department. Ms. Bishop recalled plaintiff saying: "She gets her tuition paid and all I get is a slap on the butt." Ms. Bishop further recalled plaintiff saying: "He's going to pay for this if I don't

get my tuition paid." Plaintiff denies having made this latter statement. (Defendants' statement of facts, ¶ 9; Plaintiff's statement of facts, ¶ 9).

(4) Dr. Keith Behnke, a professor in Grain Science, stated that during the week of January 25, plaintiff asked Dr. Behnke for a letter of recommendation to the public administration program, and that plaintiff also told Dr. Benke that Dr. Deyoe had hit her on the butt.

Based on Dr. Deyoe's denial of plaintiff's allegations, and that fact that others had not confirmed plaintiff's claim of having brought the December 22 incident to their attention, Dean Woods stated that the University could not conclude whether sexual harassment had occurred. Dean Woods went on to state, however, that if plaintiff's claims had been substantiated, he believed such claims would constitute sexual harassment under University policy. For this reason, Dean Woods sent a letter to Dr. Deyoe, which included the following instructions:

1. That he continue to be professional in his behavior toward [plaintiff] and other employees, and that he pay special attention to conducting himself so that none of his actions can be perceived as sexually harassing.

2. That he avoid any actions that could be perceived as retaliatory toward [plaintiff] for making [the] complaint.

3. That he carefully review the University's policy on sexual harassment.

Dean Woods closed by assuring plaintiff of the University's intention to maintain a non-discriminatory work environment, and by informing plaintiff of her right to review by the Classified Discrimination Review Committee. (Ehts. 10 & 11 to Defendants' Motion in Support, Doc. 25).

On April 20, 1988, plaintiff brought a formal complaint to the Discrimination Review Committee charging Dr. Deyoe with sexual harassment. In this letter, plaintiff reiterated most of her claims considered by Dean Woods, and further claimed that she was suffering from retaliation in the form of a hostile work atmosphere. On April 28, 1988, plaintiff requested through her attorney that the hearing before the Review Committee be conducted as an open hearing.

Also on April 28, plaintiff wrote to Dr. Deyoe, stating that she was unable to continue working in the present work environment in the office, and requesting a leave of absence without pay, in accordance with University policy. By letter dated April 29, 1988, Dr. Deyoe informed plaintiff that he did not believe the work environment prevented her from fully meeting the responsibilities of her position. Nonetheless, Dr. Deyoe granted plaintiff's request for a leave of absence and also reminded plaintiff that the appointment she was on at that time terminated on June 17, 1988.

On May 5, 1988, the Review Committee, chaired by Professor Robin Higham, held an open hearing on plaintiff's complaint. At the hearing, plaintiff called Kim Hoffman, who had been an employee in the Grain Science Department from June 4, 1985 until May 19, 1986. Hoffman testified that during her employment as Charles Deyoe's secretary, she and Dr. Deyoe had had a conversation in which she had asked for time off to attend the Kansas Artificial Insemination School. During this conversation, Dr. Deyoe made joking comments about artificial insemination and said to her: "I'm going to inseminate you." Hoffman also testified that June Bishop told Dr. Deyoe of Hoffman's distress over his comments, and that the next day Dr. Deyoe apologized to Hoffman that his comments had offended her. Hoffman also testified that Dr. Deyoe had asked her: "What would you do if I hit you on the butt," but that she had "never really considered it a threat until [plaintiff] called her." (Defendants' statement of facts, ¶ 18). Hoffman also testified that she had participated in telling jokes in the department and to Dr. Deyoe, some of which were sexually explicit.

On May 11, 1988, the Discrimination Review Committee sent to President Jon Wefald the following findings and recommendations:

FINDINGS:

The committee's findings are broken down into two categories: those relating to the complaint of sexual harassment, and those relating to the retaliation as a result of the filing of a sexual harassment complaint.

I. Sexual harassment Complaint

a. There is insufficient evidence to establish that the alleged 22 December 1987 incident actually occurred.

b. Dr. Deyoe did on the occasions engage in impermissible language and inappropriate actions. Specifically, we concluded that:

i. Dr. Deyoe used profanity and improper sexually-explicit language in the office.

ii. Dr. Deyoe inappropriately made direct sexually-explicit statements to a former employee.

iii. Dr. Deyoe inappropriately listened to sexual jokes related to him by a former employee.

iv. Dr. Deyoe failed to discourage his office staff from using profanity and other offensive conversation within the working environment.

II. Retaliation Complaint

There was hostility in the main office of the Department of Grain Science which accelerated with Mrs. Campbell's request for tuition payment and escalated much further after she filed a sexual harassment complaint against Dr. Deyoe.

a. Dr. Deyoe would have been within his rights not to support Mrs. Campbell's tuition payment request. The remission of fees for classified employees is not a well established policy in the department, so his failure to act upon her request is not viewed as an act of retaliation for filing the sexual harassment complaint.

b. Dr. Deyoe was within his prerogative to assign work to classified employees other than his administrative assistant, Mrs. Campbell. However, Dr. Deyoe showed insensitivity to the rights of an employee to file a sexual harassment complaint, but Mrs. Camp-

bell was not sensitive either to Dr. Deyoe's needs.

c. Dr. Deyoe failed to address the obvious escalating hostility developing among some of the classified employees working in the main office. There is no evidence that he took significant steps to remedy the problem.

d. Mrs. Campbell was partly responsible for the growing hostility within the departmental office's working environment. She contributed by not cooperating with other office staff, and on more than one occasion, by accusing Dr. Deyoe of engaging in retaliatory behavior.

e. Mrs. June Bishop, the office supervisor, shared the blame for the growing hostility within the Department because she discussed the case with another employee and made a derogatory remark about the complainant contrary to Dean Wood's direction.

RECOMMENDATIONS

1. That Dr. Deyoe be counseled as to his behavior, language, and lack of sensitivity to the feeling of those around him. That within a suitable time the Dean review the situation in the department to see that the suggested corrective actions have taken place, and continue to monitor the situation until they have. We do not, however, recommend the removal of Dr. Deyoe from his position as Head of the Department.

2. Mrs. Campbell should have restored to her payment for the leave which she has felt forced to take since March 2 when she filed her suit and shall continue to be paid and remain on leave until her contract expires on June 17, 1988.

3. That the working environment in the main office of the Department of Grain Science and Industry be evaluated as soon as possible by an outside team under the auspices of the Affirmative Action Office.

4. That Mrs. June Bishop be admonished for expressing her opinion of the complainant in the sexual harassment charge with another member of the Department of Grain Science and Industry

after being directed by Dean Woods not to discuss the charge.

5. That to avoid the potential acceleration of tensions within the department or unit concerned as was evident in this case, the University's Affirmative Action Plan should be revised to provide a person who brings a complaint (or is named in a complaint) an option to be placed in another working environment until the matter is resolved.

(Report of May 11, 1988 by the Discrimination Review Committee, Eht. 19 to Defendant Motion in Support, Doc. 25).

On June 3, 1988, Kansas State University President, Jon Wefald, concurred with the recommendations of the Discrimination Review Committee. President Wefald asked Dean Woods to carry out the recommendations and to inform him when all recommended action had been taken. By June 21, 1988, Dean Woods had carried out all of the recommendations of the Discrimination Review Committee and reported to President Wefald.

On May 16, 1988, Dean Woods offered to move plaintiff to the Office of the Dean of Agriculture until June 17, 1988, the date on which plaintiff's appointment was to terminate. In this offer, Dean Woods described the work assignment and assured plaintiff that she would have three days of vacation restored and that her pay would remain the same. On May 19, 1988, plaintiff, through her attorney, declined the transfer to the Dean's Office. On June 16, 1988, Dean Walter Woods notified plaintiff that the University intended to offer her a one-year term appointment beginning June 18, 1988, as an administrative assistant in the Library. In his letter he asked her to contact Dr. Brice Hobrock, Dean of Libraries, who would prepare her contract and communicate the responsibilities of the position.

By letter dated June 20, 1988 to Dr. Bobrock, plaintiff declined the offer for the position as administrative assistant in the Library. In this letter, plaintiff explained that she felt that the offer was "tainted" because of her sexual harassment complaint. Plaintiff stated that during the course of the interview, she was asked whether she would "involve the staff in [her] hostilities because the committee had ruled against [her]." Plaintiff also stated that she was asked whether she would use the position to enlist sympathy for her case. Finally, plaintiff expressed concern that the position was not the equivalent of her position at the Grain Science Department because the library position was funded for only one year. (Eht. 29 to Defendant's Motion in Support). Both Dean Woods and Dean Hobrock replied to plaintiff, assuring her that the position was an equivalent one-year appointment, and that the offer was not in any way "tainted" by her having brought a complaint of sexual harassment.

On September 27, 1988, a referee for the Kansas Department of Human Resources concluded that plaintiff had "failed or refused to accept suitable work without good cause."

## II. *Discussion*

### A. Sexual Harassment

■■■ Unlawful employment practices under Title VII include discrimination based on sex that " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. § 1604.11(a)). For claims of sexual harassment based on a "hostile work environment" to be actionable, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee,* 682 F.2d 897 (11th Cir.1982)). *See also Ramsey v. City & County of Denver,* 907 F.2d 1004, 1011 (10th Cir.1990); *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 575 (10th Cir.1990). Sexual harassment need not involve conduct that is explicitly sexual in nature, but may include " 'any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of

the employee or employees....'" *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413, 1415 (10th Cir.1987) (quoting *McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C.Cir.1985)). *See also Laughinghouse v. Risser*, 754 F.Supp. 836, 840 (D.Kan.1990). Whether the challenged conduct rises to an actionable level is a fact-specific question that depends upon the totality of the circumstances. *Hicks*, 833 F.2d at 1413.

Plaintiff relies on the following evidence to support her claim of a hostile work environment: Dr. Deyoe crowded plaintiff in her office space and made knee to knee contact with her that made her feel uncomfortable; he used obscenities in talking to her about others; he threatened plaintiff at least a half dozen times to slap her on the butt; on December 22, 1987, Dr. Deyoe slapped plaintiff on the butt after she had just delivered a message to him, and plaintiff made it clear that this conduct was unwelcome; in January 1988, Dr. Deyoe told plaintiff that he would hit her again but obviously she did not like it; Dr. Deyoe had previously threatened a former secretary, Kim Hoffman, that he would hit her on the butt and also threatened to inseminate her.[1] (Doc. 28, at 9).

■ Defendants dispute that any of the alleged conduct of Dr. Deyoe "had much to do with the fact that plaintiff is female." Doc. 25, at 19. The court cannot agree. Wherever else such conduct might be acceptable, a slap on the buttocks in the office setting has yet to replace the hand shake, and the court is confident that such conduct, when directed from a man towards a woman, occurs precisely and only because of the parties' respective gender.

■ Defendants also contend that the alleged conduct does not constitute sexual harassment under Title VII as a matter of law. The court finds that plaintiff's allegations, although minimal, are sufficient to create an issue of fact regarding the existence of actionable sexual harassment. *See Mahoney v. Driscoll*, 727 F.Supp. 50, 52 (D.Mass.1989) (allegations of threats on two occasions plus intimidating work environment sufficient to state claim).

■ Finally, the defendant University challenges plaintiff's sexual harassment claim on the ground that it cannot be held accountable for the actions of Deyoe. A prima facia case of hostile work environment sexual harassment against an employer requires a showing of harassment by the employer itself or by an employee whose acts may be imputed to the employer under some agency theory. *See Henson v. City of Dundee*, 682 F.2d 897, 905 & n. 9 (11th Cir.1982); *Halasi–Schmick v. City of Shawnee*, 759 F.Supp. 747, 751 (D.Kan. 1991). There is no allegation that Dr. Deyoe was plaintiff's actual employer, and the University's liability must therefore be based on an agency theory.

In *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir.1987), the court examined three agency principles under Restatement (Second) of Agency § 219 (1958) as possible bases for subjecting an employer to liability for its agent's acts of sexual harassment: (1) acts within the scope of the agent's employment; (2) employer negligence or recklessness in failing to respond to complaints of sexual harassment; and (3) tortious acts within the scope of the agent's apparent authority, or acts whose accomplishment is aided by the existence of the agency relationship. Because the first of these is largely irrelevant to employer liability under Title VII, *Hicks*, 833 F.2d at 1418, the court examines plaintiff's claim under the second and third agency theories.

1. Employer Negligence or Recklessness

■ In the context of claims of sexual harassment, employer negligence or reck-

---

[1] Plaintiff has made no averment that she was aware of Deyoe's actions toward his former secretary. Although the court must consider evidence of sexual harassment against persons other than the plaintiff in passing on a claim of hostile work environment sexual harassment, *see Hicks*, 833 F.2d at 1416, the past incidents related by Hoffman, of which plaintiff apparently had no knowledge, could not have contributed to the hostility that she perceived in the Department. Nonetheless, Hoffman's allegations of past sexual harassment from Deyoe are relevant to the credibility of Deyoe's denial of plaintiff's allegations. *See* Fed.R.Evid. 404(b).

lessness "is defined as 'failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.'" *Hirschfeld v. New Mexico Corrections Dep't,* 916 F.2d 572, 577 (10th Cir.1990) (quoting *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1516 (9th Cir.1989)). Plaintiff alleges two separate sets of inaction on the part of the University that would expose the University to direct liability for its negligence or recklessness. *See id.* at 577 n. 5 (distinguishing between derivative liability under respondeat superior and direct liability for negligence or recklessness); *Baker v. Weyerhaeuser Co.,* 903 F.2d 1342, 1346 (10th Cir.1990). First, plaintiff contends that the University failed to act to remedy Deyoe's conduct prior to plaintiff's formal complaint of February 18, 1988. Second, plaintiff alleges that the University's response to her formal complaint was inadequate. The court addresses these allegations in turn.

a. *University Inaction Before Formal Complaint*

■ Plaintiff charges that the University was "negligent or reckless in allowing Charles Deyoe to not only bully and threaten one secretary but to continue such behavior, including a physical attack on Carla Campbell." (Doc. 28, at 14). Although plaintiff did not file a formal complaint until February 18, 1988 which the University thereafter acted upon, the University may not escape liability by belatedly correcting an employee's harassing conduct when it might reasonably have been expected to take such corrective action earlier. *See Baker,* 903 F.2d at 1348 (employer who knew of previous harassing conduct should have fired known sex maniac earlier). Before defendant can be said to have negligently or recklessly "allowed" Deyoe to commit these acts, however, plaintiff must make some showing that defendant had knowledge of Deyoe's conduct. "The

employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Henson,* 682 F.2d at 905 (citations omitted). *See also Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir.1988); *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1529 (M.D.Fla.1991).

■ There is only limited evidence that— prior to plaintiff's formal complaint brought on February 18, 1988—University personnel other than plaintiff and Deyoe had any knowledge of Dr. Deyoe's alleged sexually harassing conduct: (1) plaintiff alleges that she told Deanna Selby and June Bishop, the office supervisor, of the December 22, 1987 incident the day after it occurred, and told Dr. Keith Benke of the incident during the week of January 25, 1988; (2) plaintiff also alleges that Kim Hoffman, the former secretary, had previously told June Bishop of Deyoe's conduct. Although plaintiff offers no evidence that any of these fellow employees had any management-level authority, plaintiff attaches an excerpt from the "University's Policy Prohibiting Sexual Harassment." Under the heading "WHOSE RESPONSIBILITY IS IT TO PREVENT SEXUAL HARASSMENT FROM OCCURRING?" the Policy states:

it is the obligation of *supervisors* and administrators to prevent sexual harassment from occurring *or continuing.* To that end, it is essential that administrators *and supervisors* become aware of the nature of sexual harassment and fully familiar with the University's "Policy Prohibiting Sexual Harassment," and that they transmit this information to those faculty and staff in their areas of responsibility.

(Eht. 1, Plaintiff's Memo in Opposition, Doc. 28)(emphasis added).[2] Regardless of whether Selby, Benke,[3] or Bishop can be

2. The version of the University's Policy that is attached to defendant's motion in support contains no similar provision. *See* Doc. 23, Eht. 1 at p. 2, ¶¶ A.1., A.2.

3. Defendants point out in their reply memoran-

considered management-level authority, the University's Policy indicates that supervisors such as Bishop, in addition to administrators, had the responsibility to respond to complaints of sexual harassment. Thus, an issue of fact exists regarding whether the University can be charged with knowledge of the incidents of harassment occurring before plaintiff filed her formal complaint.

### b. *Inadequacy of University's Response*

■ The second manner in which the University is alleged to have been negligent is in its response to plaintiff's complaint. Remedial actions taken by an employer with knowledge of sexual harassment must be both prompt and " 'reasonably calculated to end the harassment....' " *Sanchez v. City of Miami Beach*, 720 F.Supp. 974, 981 (S.D.Fla.1989) (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983)). Plaintiff contends that the University "knew" what happened to her, but did nothing except hear her complaint. Plaintiff suggests several omissions on the part of the University: Dean Woods failed to reprimand Deyoe; Dean Woods should have offered to remove plaintiff to another University position away from Deyoe pending resolution of her complaint—which became the general University policy as a result of plaintiff's complaint; Dean Woods should have spoken to Kim Hoffman about the sexual abuse she allegedly suffered at the hands of Deyoe; Dean Woods should have given plaintiff the opportunity to discuss with him the information he had gathered from others before issuing his report; the Discrimination Review Committee failed to determine the facts based on the credibility of the witnesses; and the Committee "should have anticipated opposing testimony and made provision to protect the complaining party rather than defend the alleged harasser." (Plaintiff's Opposition in Response, Doc. 28, at 17).

The University's response to plaintiff's complaint was tempered by the fact that both Dean Jones and the Discrimination Committee found "insufficient evidence" to support plaintiff's allegation of the December 22 incident. *See Swentek v. USAir, Inc.*, 830 F.2d 552, 558 (4th Cir.1987) (employer is required to investigate but not necessarily credit plaintiff's allegations of sexual harassment). Nonetheless, Dean Jones sent a letter to Dr. Deyoe that admonished him to refrain from any action that might be perceived as sexually harassing or as retaliatory towards plaintiff for making the complaint, and to review the University's policy on sexual harassment. After conducting its own hearing at which plaintiff was allowed to present evidence and call witnesses, the Committee found specific instances of inappropriate conduct by Dr. Deyoe, recommended counseling for him, and charged Dean Jones with the responsibility to ensure that the recommended corrective action be implemented. Plaintiff presents no evidence of sexual harassment after the University responded. *See Hirschfeld*, 916 F.2d at 578 (important that no complaints followed after demotion of harasser).

The comprehensiveness of the University's response weighs heavily in favor of a finding that the University promptly and effectively remedied plaintiff's allegations of harassment. The summary judgment motion, however, is rarely an appropriate vehicle for assessing the reasonableness of an employer's response to complaints of sexual harassment. Given this, plus the court's finding that other issues remain for trial, the court believes "that the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### 2. Acts Aided by Existence of Agency Relationship

■ Under § 219(2)(d) of the Restatement (Second) of Agency, a principal will be liable for the acts of his servant if "the servant purported to act or to speak on behalf of the principal and there was

---

dum that plaintiff's deposition testimony disavowed any expectation of corrective action from Dr. Benke. ("Attachment A" to Doc. 29). According to this testimony, plaintiff told Dr. Benke of her complaint against Deyoe only with the expectation that he "be a listener." *Id.*

reliance upon apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.*" (emphasis added). In *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 579 (10th Cir.1990), the court held that Title VII employer liability may not be based upon § 219(2)(d) of the Restatement where the wrongdoer had no supervisory authority over plaintiff. In this case, however, it is undisputed that Deyoe was the direct supervisor of plaintiff, and viewing matters in a light most favorable to plaintiff the court cannot say that Deyoe did not invoke his supervisory authority "in order to facilitate his harassment of plaintiff." 916 F.2d at 579. Thus, the court concludes that § 219(2)(d) is also a potentially viable theory for imposing liability on the University for Deyoe's actions.

## B. Retaliation

Defendants move for summary judgment on plaintiff's claim of retaliation in violation of Title VII. Plaintiff contends that in retaliation for filing her complaint with the University, and later with the EEOC, she suffered several adverse employment actions at the hands of defendants: she was forced to continue working with her harasser; Deyoe and Bishop refused to communicate with her, making her job difficult and ultimately forcing her to request a leave of absence without pay; she was told by Deyoe that her contract with the University terminated in June 1988; and she was offered an inferior temporary position in the Library.

■■■ Retaliation against an employee who engages in activity protected under Title VII is made unlawful under § 704(a) of Title VII, which provides in part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, ... because he has opposed any practice made an unlawful employment practice by this, or because he has made a charge, testified, asserted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e–3(a). A prima facie case of retaliation in violation of Title VII requires that the plaintiff show: "1) she engaged in protected opposition to discrimination or participation in a proceeding arising out of discrimination; 2) adverse action by the employer subsequent to the protected activity; and 3) a causal connection between the employee's activity and the adverse action." *Archuleta v. Colorado Dep't of Institutions*, 936 F.2d 483, 486 (10th Cir.1991). Plaintiff's claim is based on activity falling within the "opposition clause" of the statute, which protects activity other than participation in EEOC hearings. *See Allen v. Denver Public School Bd.*, 928 F.2d 978, 985 (10th Cir.1991) (retaliation for filing grievance with teacher's association cognizable under § 704(a)). A person who engages in activity protected under the opposition clause of § 704(a) need not prove that the discrimination she opposed actually occurred, but only that she had a good faith belief that Title VII had been violated. *Love v. Re/Max of Am., Inc.*, 738 F.2d 383, 385 (10th Cir.1984). *See also Blizzard v. Newport News Redevelopment & Housing Auth.*, 670 F.Supp. 1337, 1344 (E.D.Va.1984) (although opposition clause requires reasonable belief, participation clause grants absolute privilege). Thus, plaintiff's lack of success on the original charge of discrimination does not defeat a claim of retaliation under § 704(a). *Archuleta*, 936 F.2d at 486–87.

■■■ Defendants argue that plaintiff's claims of retaliation are not cognizable under Title VII because no economically adverse employment action was taken against her. Defendants characterize plaintiff's grievances as nothing more than petty miscommunications and minor annoyances that indicate, at most, Deyoe's uncomfortableness in working with plaintiff after she filed her complaint.

In *Drez v. E.R. Squibb & Sons, Inc.*, 674 F.Supp. 1432, 1436–39 (D.Kan.1987), Judge Saffels ruled that a plaintiff sustaining no economic injury from job harassment nonetheless has a claim under the ADEA's anti-retaliation provision, if the retaliatory harassment was sufficiently severe under

the "hostile work environment" standard of *Vinson*. *See also Curl v. Reavis*, 740 F.2d 1323, 1329 n. 5 (4th Cir.1984) (filing of EEOC charge may well engender disruption in work place, but Congress elected to protect such persons from retaliation). The court need not decide whether this might applying equally to Title VII retaliation, however, because plaintiff also alleges that the office hostility became sufficiently severe to prompt her to request leave without pay, and that Deyoe refused to renew her contract in retaliation for her complaint. Thus, the allegations state adverse economic employment actions of a type prohibited by Title VII.

## C. Discharge

Plaintiff alleges that she was either terminated or constructively discharged for making her complaint. Defendant challenges both of these claims, which the court addresses in turn.

### 1. Actual Discharge

█ Although plaintiff's contract expired on June 17, 1988, plaintiff contends that she was effectively terminated from a position that would have continued had she not brought a harassment complaint against Dr. Deyoe. Defendant relies on language in plaintiff's contract, which states: "It is understood that this appointment carries with it no expectation of continuing employment and no consideration for tenure, and that the standards of notice of non-reappointment do not apply." (Eht. 7 to Defendant's Motion in Support, Doc. 25). Defendant argues that by virtue of this contractual provision, the University was not obligated to reappoint plaintiff as an administrative assistant.

Be that as it may, plaintiff has alleged that the decision not to reappoint her was motivated, in part or in whole, by her complaint against Deyoe. Notwithstanding the absence of any contractual "obligation" on the part of defendants to reappoint plaintiff, or even of an expectation of employment rising to the level of a property interest protected by due process, § 704(a) prohibits an employer from taking retaliatory

adverse employment actions against "any of his employees *or applicants for employment,....*" (emphasis added). Proof of a causal connection between plaintiff's protected activity and the University's failure to reappoint her would constitute a violation of a statutory duty that may not be avoided by contract.

### 2. Constructive Discharge

█ Alternatively, plaintiff claims that the hostile working environment, the failure to reappoint her to her previous position, and the offer an inferior employment position led to her constructive discharge from the University. "[T]he question on which constructive discharge cases turn is simply whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986). *See also Ramsey v. City & County of Denver*, 907 F.2d 1004, 1010 (10th Cir.1990); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir.1990). Defendant contends that it was unreasonable for plaintiff to refuse the offer to work in the Library, and that in any event plaintiff had told her counselor in May 12, 1988 that she did not intend to work at the University again.

The court finds that material issues of fact exist regarding whether defendants' alleged discriminatory and retaliatory acts made plaintiff's working conditions so difficult that she reasonably felt compelled to request leave and subsequently refused any further employment at the University. The court also finds that the statement to plaintiff's counselor only presents an issue of fact regarding whether plaintiff herself or the University's alleged retaliatory actions were the cause of her loss of employment at the University. *See Unified School Dist. No. 457 v. Phifer*, 729 F.Supp. 1298, 1304 (D.Kan.1990) (plaintiff's resignation defeated liberty interest claim). Defendants' motion on the constructive discharge claim will therefore be denied.

### D. Due Process

█ Plaintiff argues that she had a continued right to employment at the University protected by procedural safeguards of due process that were not observed in her case.[4]

█ Property interests within the procedural guaranties of the fourteenth amendment are not created by that provision, but rather derive from independent sources such as state law. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). "Property interests 'arise from sources such as state statutes, local ordinances, established rules, or mutually explicit understandings.'" *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1231 (10th Cir.1990) (quoting *Dickeson v. Quarberg,* 844 F.2d 1435, 1437 (10th, Cir.1988)). In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Court found no procedurally protected property interest for a non-tenured University teacher under a fixed term of employment. Because "the terms of [the teacher's] appointment secured absolutely no interest in reemployment," nor "was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it," the teacher had no property interest requiring any hearing. *Id.* 408 U.S. at 578, 92 S.Ct. at 2710.

Plaintiff presents the court with nothing more than a unilateral expectation of continued employment that has no basis in state law or University policy. *See Roth,* 408 U.S. at 577, 92 S.Ct. at 2709 (plaintiff must have more than abstract need or unilateral expectation). Plaintiff apparently attempts to construct an implied contract of continued employment from the University's past practice. Although "agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances'" can be sources of property interests, *Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972), "[a] property interest ... cannot be inferred from a consistent practice without some basis in state law." *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 223 n. 9, 106 S.Ct. 507, 512 n. 9, 88 L.Ed.2d 523 (1985). *See also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1154–55, 71 L.Ed.2d 265 (1982).

In the absence of controlling contractual provisions, Kansas law allows for the creation of implied contracts of employment under certain conditions. *See Enstrom v. Beech Aircraft Corp.,* 712 F.Supp. 841, 851–52 (D.Kan.1989). In this case, however, the express terms of plaintiff's contract foreclose such an argument. "In determining the rights which occur under an employment contract, the entitlement thereto or eligibility therefor, the terms of the contract control so long as they are not unreasonable or illegal." *Weinzirl v. Wells Group, Inc.,* 234 Kan. 1016, 1019, 677 P.2d 1004 (1984). Plaintiff's contract of employment expressly states that her appointment was to terminate on June 17, 1988, and that it carried with it no expectation of continued employment. *Cf. Morriss v. Coleman Co.,* 241 Kan. 501, 514, 738 P.2d 841, 849 (1987) (express disclaimer in employee handbook does not preclude finding of implied contract of employment). Thus, although plaintiff may have had a desire or expectation of continued employment, this expectation carried no claim of legitimacy entitling it to the protections of due process. *See Hullman v. Board of*

---

4. Although not addressed by the parties, the court notes that plaintiff's due process claim directly against Kansas State University, pursuant to 42 U.S.C. § 1983, is barred by the eleventh amendment. *Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974); *Quern v. Jordan,* 440 U.S. 332, 338–40, 99 S.Ct. 1139, 1143–45, 59 L.Ed.2d 358 (1979); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam); *Billings v. Wichita State Univ.,* 557 F.Supp. 1348, 1350 (D.Kan.1983). The University also enjoys eleventh amendment immunity from plaintiff's pendent state claims. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 120–21, 104 S.Ct. 900, 918–19, 79 L.Ed.2d 67 (1984). Nonetheless, the court considers the due process claims against Deyoe and Bishop to be claims against them in their individual capacity for their actions taken under color of state law. *See Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 3104–06, 87 L.Ed.2d 114 (1985).

**1492**

*Trustees of Pratt Community College,* 725 F.Supp. 1536, 1548 (D.Kan.1989) ("Serial reemployment pursuant to one-year contracts does not establish a legitimate expectation in continued employment.").

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion for summary judgment (Doc. 24) on plaintiff's claim of sexual harassment, retaliation, and constructive discharge be denied.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Doc. 24) on plaintiff's due process claim be granted.