Maria R. LAMB, Plaintiff,

v.

HOUSEHOLD CREDIT SERVICES, et al., Defendants.

Civil No. 95–20726 SW.

United States District Court, N.D. California.

Jan. 29, 1997.

June Michel, Carmel, CA, for Plaintiff.

Patricia K. Gillette, Tracy S. Achorn, Heller, Ehrman, White & McAuliffe, San Francisco, CA, for Defendants.

### ORDER GRANTING DEFENDANT HOUSEHOLD CREDIT SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

Plaintiff Maria Lamb brought this action against her former employer, Household Credit Services, Inc. ("HCS"),[1] alleging viola-

---

1. Plaintiff initially named her former co-worker Suthichai Livingston as a defendant, but Livingston has since been dismissed from the case for lack of service. Therefore, the only defendant remaining in the case is the employer, HCS.

tions of Title VII and various state law claims. According to Plaintiff, from approximately September 26, 1994 to October 26, 1994, a co-worker's conduct created an offensive and hostile work environment and HCS, upon learning of the situation, failed to promptly and adequately remedy the problem. Defendant HCS moves for summary judgment pursuant to Fed.R.Civ.P. 56, claiming that, as a matter of law, HCS took prompt action in response to Plaintiff's complaint that she had been sexually harassed. For the reasons set forth below, the Court agrees with Defendant and GRANTS Defendant's motion for summary judgment as to all of Plaintiff's claims.

## BACKGROUND

HCS is in the business of marketing and servicing credit cards. In September 1989, HCS hired Plaintiff as an assistant fraud investigator in the Fraud Department, which is charged with detecting fraudulent credit card use. The Fraud Department was divided into several units. Each unit included 10 to 20 assistant fraud investigators and one or more senior fraud investigators. Cheryl Durazo was a senior fraud investigator in Plaintiff's unit. At the time of the alleged harassment, John Morris was the unit manager, to whom all assistant and senior fraud investigators reported, including Plaintiff and Durazo. Morris reported to a section manager, Christopher Tracy, who in turn reported to the prevention manager, Mark Suto.

As a senior fraud investigator, Durazo had job duties that set her apart from the pool of assistant fraud investigators. Durazo handled the more difficult client telephone calls and answered other fraud investigators' questions about customer accounts. When a telephone customer asked to speak with a "supervisor," the assistant fraud investigators would forward their calls to Durazo. Plaintiff and some of her colleagues considered Durazo a "work flow supervisor."

Durazo also had some employee training and monitoring responsibilities. She often was responsible for recording employees' arrival and departure times, information later used by Morris in employee annual evaluations. Durazo had the authority to clear entrance into the secured building when an employee had forgotten a security clearance card. At Morris's direction, Durazo prepared and co-signed award certificates presented to employees based on their objective performance statistics. Durazo delivered to some employees monthly "coachings," in which she reported an employee's previous month's fraud statistics and phone quality scores. Morris reviewed and approved these reports before Durazo delivered them.

Durazo had no independent authority to hire, discipline, promote or discharge employees. Morris never asked for Durazo's opinion of the work performance of employees in his unit. Although fraud clerks would sometimes submit requests for time off through Durazo, she had to forward these requests to Morris for approval.

In August 1994, Suthichai Livingston, a former HCS security guard, joined Morris's unit as an assistant fraud investigator. Prior to hiring Livingston, HCS conducted a background investigation on Livingston, which included checks of Livingston's prior employment and personal references, as well as a criminal record check. HCS uncovered no derogatory information.

Plaintiff alleges that starting on September 26, 1994, Livingston began touching her shoulders, arm, and hair, and bumping against the back of her chair with his body. She testified that Livingston did this several times a day. Plaintiff also alleges that Livingston had grabbed her waist and touched her breast. Plaintiff alleges that she told him on many occasions to go away and leave her alone.

In Plaintiff's sworn Equal Employment Opportunity Commission ("EEOC") charge and affidavit, she alleged that she first complained to HCS about Livingston's conduct on October 24, 1994. Plaintiff was represented by counsel at the time she filed the EEOC charges. Specifically, on or about June 20, 1995, she filed a sworn EEOC charge asserting that "On October 24, 1994, I complained to management and no corrective action was taken." At the same time, she stated in a sworn EEOC affidavit: "On October 24, 1994.(sic) I complained to Mr. Joe Corina,

Work Flow Supervisor, and Ms. Cheryl Durazo, Work Flow Supervisor, and no immediate corrective action was taken." Plaintiff also identified October 24, 1994 as the date Durazo and Morris were on notice of the alleged harassment in an unsworn letter written to her attorney dated January 14, 1996.

However, in her May 1996 deposition testimony, Plaintiff claimed for the first time that Durazo had notice of the harassment as early as September 26, 1994. Plaintiff claims that she and Durazo sat very close to each other at work, and that Durazo watched when Livingston touched and bothered Plaintiff. Plaintiff further claims in her deposition testimony that she constantly complained to Durazo that Livingston was "bothering" her, and that Durazo repeatedly told Livingston to go back to his workstation. Durazo denies that she saw any inappropriate behavior on the part of Livingston until after Plaintiff complained on October 24, 1994. One of Plaintiff's coworkers, Elizabeth Archuleta, testified that she herself was aware Livingston bothered Plaintiff.

On October 24, 1994, Durazo, after being told of the harassment by Plaintiff, reported Plaintiff's complaint to Morris. Plaintiff also complained directly to Morris. Within one hour of Plaintiff's complaint, Morris met with Livingston. Without mentioning Plaintiff by name, Morris counseled Livingston regarding his behavior. Morris instructed Livingston that his behavior was inappropriate and must stop. Morris told Livingston that he would be further disciplined if he continued to engage in any inappropriate conduct. Livingston admitted to Morris that he had touched women in the unit, but that he was not aware that he was offending or bothering anyone. He agreed to stop touching his coworkers.

The following day, October 25, Livingston approached Plaintiff, touched her, and kicked her chair. While he did this, Livingston boasted to Plaintiff that he had been instructed not to touch or bother her.

The following day, October 26, Plaintiff asked Durazo to arrange a meeting with three HCS managers, Morris, Tracy, and Suto, to discuss her complaint about Livingston. That same morning, Plaintiff complained to Tracy about Livingston's conduct. Within an hour, Tracy had arranged for Plaintiff to meet at 10:30 that morning with Corinne Lopez–Allen, a Human Resources representative. In addition, pending the arrival of Lopez–Allen, Morris met with Livingston and instructed him not to approach Plaintiff or walk down her aisle under any circumstances.

Lopez–Allen did not arrive for the meeting with Plaintiff at the scheduled time. Shortly thereafter, Tracy contacted HCS's Director of Human Resources, Alan Movson, to determine the course of action to be taken. Movson immediately launched an investigation into Plaintiff's allegations, and revoked Livingston's access to HCS's facilities. The next day (October 27, 1994), Movson placed Livingston on an administrative leave of absence, pending the investigation. On October 28, based on the finding in the investigation that Livingston had continued his inappropriate behavior after having been counseled, HCS terminated Livingston's employment.

Plaintiff left on a disability leave on October 27, 1994. She remained on leave until she resigned from HCS on April 17, 1995. She filed this suit on October 26, 1995, alleging employment discrimination in the form of "hostile environment" sexual harassment under Title VII, 42 U.S.C.2000e, et seq., in addition to state law claims of tortious ratification, tortious authorization, negligent hiring and negligent retention.

## LEGAL STANDARD

To defeat HCS's motion for summary judgment, Plaintiff must show that there is a genuine issue of material fact as to each element of her claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Summary judgment is granted when there is no genuine issue as to any material fact and that moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986).

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

The adjudication of a summary judgment motion is not a "trial on affidavits." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Credibility determinations and weighing of the evidence are solely jury functions. *Id.* Inferences drawn from underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). However, there may be no genuine issue of material fact if "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the nonmoving party. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513.

Summary judgment is appropriate in this case. First, the undisputed facts demonstrate that, as a matter of law, Durazo is not a management employee whose alleged knowledge of the harassment can be imputed to her employer. Second, Plaintiff has failed to offer facts demonstrating a genuine issue for trial concerning the date of Durazo's knowledge of the alleged harassment. Third, the uncontroverted facts show that HCS responded promptly and appropriately to Plaintiff's complaint of sexual harassment.

## DISCUSSION

### 1. *The Title VII Claim*

Title VII of the 1964 Civil Rights Act prohibits sex discrimination in employment. 42 U.S.C. § 2000e–2(a)(1). This prohibition extends to sexual harassment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 73, 106 S.Ct. 2399, 2408–09, 91 L.Ed.2d 49 (1986). The Supreme Court has held that under Title VII, employers can be held liable for the acts of sexual harassment by their employees that create a "hostile work environment." *See Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408. To establish employer liability under this theory, a plaintiff must establish that he or she was subjected to a hostile work environment, that the employer knew or should have known of the harassment, and that the employer failed to appropriately remedy the problem. *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995), *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515–16 (9th Cir.1989).

The Court will assume for the purposes of this motion that Livingston's conduct created a hostile work environment.[2] "However, even if a hostile working environment exists, an employer is only liable for failing to remedy harassment of which it knows or should know."[3] *Fuller,* 47 F.3d at 1527.

#### a. *As a matter of law, Durazo is not a management-level employee whose knowledge of the harassment can be imputed to HCS*

Plaintiff alleges in her deposition testimony that Durazo, a senior fraud investigator, had knowledge that Livingston was bothering Plaintiff as early as September 1994, approximately one month before any manager had knowledge of the harassment. Therefore, the question confronting the court is

**2.** To establish a Title VII violation due to offensive work environment on the basis of sexual harassment, a plaintiff must show she was subjected to verbal or physical conduct of a sexual nature; that conduct was unwelcome; and that conduct was sufficiently severe or pervasive to alter conditions of the victim's employment and create abusive working environment. *Fuller,* 47 F.3d at 1527. For the purposes of this motion, HCS does not expressly challenge the claim that Livingston's conduct amounted to sexual harassment.

**3.** Plaintiff does not allege that HCS "should have known" of the alleged harassment. An employer without notice can be held liable for co-worker sexual harassment where the harassment is sufficiently severe or pervasive that employer awareness must be inferred. *See Katz v. Dole* 709 F.2d 251, 255 (4th Cir.1983). Plaintiff has admitted that Livingston usually bothered her when no managers were present.

whether Durazo is a "management-level employee" under Title VII whose knowledge of the alleged harassment can be imputed to HCS.[4]

The term "management-level employee" has not been clearly defined under Title VII. In *Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408, the Supreme Court declined to issue a definitive rule on employer liability for harassment resulting from an abusive or hostile environment in the workplace, but directed courts to look to agency principles, at least where the alleged harassment is perpetrated by a supervisor.

The co-worker harassment cases that have followed *Vinson* have imputed knowledge to employers in several different contexts. Courts consistently impute knowledge where the person receiving notice of harassment is a supervisor or manager possessing substantial authority to hire, fire, promote, or discipline employees. *Hacienda Hotel,* 881 F.2d at 1516 (imputing knowledge to employer where housekeeping supervisor had authority to hire, discharge, and discipline the sexually harassed employees); *Hall v. Gus Const. Co.,* 842 F.2d 1010 (8th Cir.1988)(imputing to employer knowledge of construction foreman who had hired the plaintiffs to work as traffic controllers at various road construction sites)[5]; *Guy v. Day Products, Inc.,* 67 E.P.D. ¶ 43,874, 84,381, 84,386 (E.D.Pa.1995) (refusing to impute knowledge of third-highest ranking executive because he lacked authority to hire and fire).

■ A mere title of "manager" or "supervisor" does not by itself suffice to impute that employee's knowledge or actions to the employer. *Ulrich v. K–Mart Corp.,* 858 F.Supp. 1087, 1093 (D.Kan.1994)(holding employer not liable for allegedly harassing activities of an employee who had title of "loss control manager" but lacked authority to hire, fire, discipline, control employees' wages, or control employees' schedules); *Hunter v. Countryside Assoc. for the Handicapped, Inc.,* 723 F.Supp. 1277, 1278 (N.D.Ill. 1989) (holding that alleged harasser, whose title was "client supervisor," did not have the kind of supervisory powers necessary to impute his conduct to the employer: alleged harasser lacked authority to hire, promote, fire or discipline)

■ In a narrow set of circumstances, courts will also attribute a non-manager's knowledge to an employer. For example, the clock starts running on employer liability when notice is given to certain employees, who may or may not have any management-level authority, but who have responsibility for relaying sexual harassment complaints pursuant to an express policy promulgated by the employer. *Campbell v. Board of Regents of the State of Kansas,* 770 F.Supp. 1479, 1487–88 (D.Kan.1991). Similarly, employer liability also kicks in when an employee complains of co-worker harassment to a non-management employee who has general responsibility for passing employment-related complaints up the corporate hierarchy. *Llewellyn v. Celanese Corp.,* 693 F.Supp. 369, 380 (W.D.N.C.1988) (employer deemed on notice when dispatcher received sex harassment complaint from a female truck driver). In addition, knowledge of a low-level supervisor will be imputed to the employer where the supervisor was the only convenient avenue through which to lodge the complaint. *Morris v. American National Can Corp.,* 730 F.Supp. 1489, 1496 (E.D.Mo.1989). Courts have also imputed to employers knowledge of non-managerial employees who exercise substantial control over workplace conditions. *See, e.g., Robinson v. Jacksonville Ship-*

---

**4.** The nature of Durazo's job is undisputed, so summary judgment regarding whether Durazo is a management-level employee is appropriate. The Court's conclusion depends not on factual findings regarding the job, but on the implications of the employment with the Title VII framework. The Court may properly rule on the issue as matter of law. *See Horton v. Taylor,* 767 F.2d 471, 478 (8th Cir.1985). In any event, because this question of employer notice, and thus employer liability, will likely have an impact on future cases and conduct, this question is better treated as one of law than as one of fact for a jury to consider. *See Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501 n. 17, 104 S.Ct. 1949, 1960 n. 17, 80 L.Ed.2d 502 (1984).

**5.** The court also called the foreman the "agent" of the construction company, *Hall,* 842 F.2d at 1016, apparently analogizing to cases of co-worker harassment the *Vinson* directive that courts look to agency principles in cases of supervisor harassment.

*yards,* 760 F.Supp. 1486, 1492–93, 1512, 1530 (M.D.Fla.1991)(imputing knowledge to employer where quartermen and leadermen with knowledge of harassment exercised apparent authority to respond to complaints of sexually harassment, were often the most senior people in a work area, acted as conduits for the relay of complaints to higher management, and received explicit instructions concerning their authority to exercise discretion to control the work environment).

However, just because one employee holds a more senior position than another does not necessarily qualify him or her as a supervisor or manager whose knowledge or acts can be imputed to the employer. The Fourth Circuit found no employer. liability under Title VII for a pilot's acts toward a flight attendant because the pilot had no authority to hire, fire, promote or demote flight attendants. *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557–58 (4th Cir.1987). In *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715–16 (2d Cir.1996), the Second Circuit refused to impute to the employer notice given to a low-level supervisor who worked outside of the plaintiff's department. The Second Circuit adheres to a general rule that for the knowledge of a supervisor to be imputed to the company, that supervisor must be "at a sufficiently high level in the hierarchy of the company." *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992); *see also Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.1994), cert. denied, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). However, other circuits tend to attribute to employers knowledge where employees report harassment to a superior in his or her chain of command. *See, e.g., Waltman v. International Paper Co.,* 875 F.2d 468, 478 (5th Cir.1989) (reversing summary judgment for employer on issue of notice where plaintiff thrice reported incidents to higher management, including her in-line supervisor).

■ Taken as a whole, the cases demonstrate that for purposes of Title VII, "management-level employees" encompass two groups of persons: first, supervisors possessing substantial authority and discretion to make decisions concerning the terms of the

harasser's or harassee's employment; and second, non-management employees charged with substantial responsibility for relaying employee complaints to management, particularly where management is located away from the workplace. If a co-worker has knowledge of a harassee's complaint, but that co-worker lacks authority to counsel, investigate, suspend, or fire the accused harasser, or to change the conditions of the harassee's employment, the co-worker's inaction does not spark employer liability unless that co-worker has an official or strong *de facto* duty to act as a conduit to management for complaints about work conditions. On the other hand, if an employee with knowledge of harassment possesses the authority to make discretionary employment decisions concerning the harasser or harassee, employers may be liable if that employee fails in his or her responsibility to take appropriate action.

In the present case, the uncontroverted facts show that Durazo had no authority to use her independent judgment on matters affecting the terms and conditions of Plaintiff's, or anyone else's, employment. Durazo had no authority to hire, fire, or discipline employees, or recommend such action. Durazo had no control over wages paid to HCS employees, nor did she participate in recommending or approving pay increases. The only supervisory duties performed by Durazo involved one of two things: Durazo had greater authority than Plaintiff concerning customer-related matters; and Durazo presided over a limited set of purely ministerial employee training and monitoring which required no independent judgment on her part. In addition, although Plaintiff characterizes Durazo as a "work flow supervisor," the attribution of this pseudo-title cannot trump the fact that Durazo had no discretionary control over the terms and conditions of Plaintiff's or Livingston's employment.

In addition, Plaintiff has made no showing that Durazo had either an official or strong *de facto* duty to act as a conduit to management for complaints about work conditions. Furthermore, since Plaintiff's manager, Morris, worked in the same general area as Durazo and Plaintiff, Plaintiff cannot argue

that Morris's inaccessibility compelled her to resort to complaining to Durazo.

Accordingly, Durazo's purported knowledge of a hostile work environment cannot be imputed to HCS.

b.  *HCS received notice of the sexual harassment on October 24, 1994*

■ Even if Durazo was a management-level employee whose knowledge could be imputed to HCS, Plaintiff's deposition testimony that she complained to Durazo about sexual harassment prior to October 24, 1994, which contradicts her sworn EEOC testimony, fails to create genuine issue of material fact as to the timing of notice to HCS.

■ A party normally will not be able to defeat summary judgment with an affidavit that directly contradicts that party's earlier affidavit or sworn testimony, unless the affidavit is accompanied by a credible explanation for the contradiction. *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir.1988); *Martin v. Merrell Dow Pharmaceuticals*, 851 F.2d 703, 706 (3d Cir.1988). The Ninth Circuit recently reaffirmed this well-established principle in the case of *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir.1996).

In June 1995, before filing this case, Plaintiff signed two sworn documents with the EEOC alleging that she first complained to HCS management of the sexual harassment on October 24, 1994. She specifically indicated that Cheryl Durazo was on notice as of October 24, 1994. In addition, in an unsworn letter written to her attorney dated January 14, 1996, she identified October 24, 1994 as the date Durazo and Morris were on notice of the alleged harassment. Plaintiff's Complaint, filed in October 1995, does not identify a date on which management allegedly had notice. It was in May 1996 that Plaintiff changed her story, claiming that Durazo was on notice that Livingston was harassing her as early as September 26, 1994.

In *Kennedy*, the Ninth Circuit upheld a grant of summary judgment because plaintiff's contradictory deposition testimony could not create a genuine issue of material fact. The court held:

[T]his deposition testimony flatly contradicts both her prior sworn statements and the medical evidence. [footnote omitted] As such, we conclude her deposition testimony does not present "a sufficient disagreement to require submission to a jury." *Id.* at 1481.

Under *Kennedy*, Plaintiff's deposition testimony is insufficient as a matter of law to create a triable issue of fact as to the timing of her first complaint of sexual harassment to Durazo. Accordingly, it remains undisputed that HCS first became aware of Plaintiff's claims of sexual harassment on October 24, 1996.

c.  *As a matter of law, HCS took prompt and appropriate remedial steps after it received notice of the sexual harassment*

■ The Court must further consider whether HCS's response, upon receiving knowledge of harassment, was sufficient to absolve it from liability. Once an employer knows or should know of harassment, a remedial obligation kicks in. *Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th Cir.1995). The obligation will not be discharged until prompt, effective, action has been taken. *Id.* Effectiveness will be measured by the twin purposes of ending the current harassment and deterring future harassment, by the same offender or others. *Id.* In this circuit, an employer's remedial obligations are defined by *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991). "Remedies should be 'reasonably calculated to end the harassment,'" and "[e]mployers should impose sufficient penalties to assure a workplace free from sexual harassment." *Ellison*, 924 F.2d at 882 (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983)). "The important point is that the appropriateness of the remedy depends on the seriousness of the offense, the employer's ability to stop the harassment, the likelihood that the remedy will end the harassment, and the 'remedy's ability to persuade potential harassers to refrain from unlawful conduct.'" *Intlekofer v. Turnage*, 973 F.2d 773, 779–80 (9th Cir.1992) (citation omitted).

As discussed above, the Court measures HCS's responsiveness from October 24, 1994. The undisputed facts demonstrate that HCS

took prompt and appropriate remedial action following notice of Livingston's conduct. In fact, one could hardly imagine a swifter, fairer, or more thorough response: within four days, HCS counseled, investigated, and fired Livingston. HCS's initial response of counseling Livingston, while also threatening more severe disciplinary measures, was sufficient as a matter of law, especially in light of the fact that HCS had heard no other complaints about Livingston's conduct and that the alleged harassment consisted more of annoying, taunting, sophomoric behavior rather than of violent or overt sexual overtures. In addition, Livingston appeared to take counseling seriously and agreed to cease all inappropriate behavior. Plaintiff argues that HCS should have fired Livingston instantly upon hearing of her complaint, but the law does not mandate such draconian measures. Indeed, HCS would have run other unwarranted legal risks if it had fired Livingston without having undertaken appropriate and prudent intermediate steps.

When HCS learned on October 26, 1994 that Livingston continued to bother Plaintiff, HCS immediately launched an investigation and removed Livingston from the workplace. Two days later, HCS terminated Livingston's employment. This swift response was appropriate as a matter of law. *See, e.g., Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996)(affirming summary judgment for employer on issue of appropriateness of employer's response where employer reprimanded harasser within four days of complaint and terminated him six days later); *Carmon v. Lubrizol Corp.,* 17 F.3d 791, 793–95 (5th Cir.1994) (finding prompt and appropriate remedial action where employer investigated, disciplined, and transferred harasser within three days of complaint); *Dees v. Johnson Controls World Services, Inc.,* 938 F.Supp. 861, 864, 866 (S.D.Ga.1996) (granting summary judgment where employer disciplined and terminated harassers several weeks after plaintiff's complaint).

As a matter of law, HCS responded appropriately and promptly to Plaintiff's com-

plaints. Therefore, HCS is entitled to summary judgment on Plaintiff's sexual harassment claim.

### 2. *The State Law Claims*

Plaintiff's state law claims of tortious authorization, tortious ratification, negligent retention, and constructive discharge[6] are grounded in allegations identical to those in her Title VII claim: that HCS failed to remedy the alleged hostile work environment created by Livingston. Since no set of facts exists suggesting that HCS intentionally caused Plaintiff harm or negligently allowed the harassment to continue, summary judgment is also GRANTED as to these claims.

Further, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's claim for negligent hiring. Plaintiff presented no evidence to suggest that HCS had any information suggesting Livingston had the propensity to harass women. To the contrary, when HCS conducted a prehire background investigation on Livingston, including a criminal record check and contact with Livingston's employment and personal references, it received no information to suggest that Livingston had ever acted in a harassing, threatening, or violent manner. In sum, Plaintiff has produced no evidence to suggest that, prior to hiring Livingston, HCS had any reason to believe that Livingston might create a hostile work environment.

### CONCLUSION

HCS had no reason to expect that Livingston would create a hostile work environment for Plaintiff. Once HCS had notice of Plaintiff's sexual harassment allegations, it took prompt and appropriate remedial action, including discharging the alleged harasser within four days. This Court therefore GRANTS HCS's motion for summary judgment on all counts.

IT IS SO ORDERED.

---

6. Although Plaintiff did not include a separate count for constructive discharge in her Com-

plaint, it is arguable that she has made that claim by implication.