Rebecca MAGNUSON, Plaintiff,

v.

**PEAK TECHNICAL SERVICES, INC., et al., Defendants.**

Civ. No. 92–885–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 2, 1992.

John F. Karl, Jr., McDonald & Karl, Washington, DC, Douglas Foord, Burke, VA, Michaele Battles, McLean, VA, for Rebecca L. Magnuson.

John David Grad, Grad & Logan, Alexandria, VA, for Volkswagen of America, Inc. and Peak Technical Services, Inc.

R. Dennis Osterman, Lerch, Early & Brewer, Chartered, Bethesda, MD, for Fairfax Imports, Inc.

Gary Wayne Brown, Miles & Stockbridge, Fairfax, VA, for Richard Blaylock.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

This case presents novel questions concerning the scope of employer liability for sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"). Plaintiff has alleged violations of Title VII and several pendent state law claims against four defendants: Volkswagen of America ("Volkswagen"), Peak Technical Services, Inc. ("Peak"), Fairfax Motor Imports d/b/a Fairfax Volkswagen ("Fairfax"), and Richard Blaylock ("Blaylock"). The amended complaint alleged five counts of wrongdoing arising from plaintiff's former employment relationship with these defendants: (1) Title VII violations for sexual harassment, discriminatory discharge, and retaliation; (2) wrongful discharge in violation of public policy; (3) breach of contract on the part of defendants Peak and Volkswagen; (4) tortious interference with employment contract on the part of defendants Fairfax Volkswagen and Blalock; and (5) conspiracy to deprive plaintiff of her civil rights under Title VII.

As a result of previous rulings, this matter is now before the Court on defendants' motions for summary judgment on the following remaining counts: Count I (Title VII claims) for all defendants; Count III (breach of contract) for defendants Peak and Volkswagen; and Count IV (tortious interference with contract) for defendants Fairfax and Blaylock.[1] For the reasons

---

1. This matter initially came before the Court on defendant Blaylock's motion for a more definite

stated below, the Court denies defendants' motions for summary judgment on Counts I and Count IV and grants summary judgment for defendants Peak and Volkswagen on Count III.

## II.

■ The facts giving rise to this lawsuit are sharply disputed by the parties. Since the matter is before the Court on defendants' motions for summary judgment, "plaintiff's version of the facts must be presented where the parties' versions conflict, at least to the degree that her allegations have support in affidavits, depositions or other documentary evidence." *Paroline v. Unisys Corp.*, 879 F.2d 100, 102–103 (4th Cir.1989), *vacated in part on other grounds* 900 F.2d 27 (4th Cir.1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (on motion for summary judgment, evidence of nonmovant is to be believed, and all justifiable inferences must be drawn in her favor). Accordingly, the facts summarized below, where disputed, reflect plaintiff's version of the events to the extent it is supported by affidavits, depositions or other documentary evidence.

Plaintiff, Rebecca Magnuson, is a twenty-seven year old Virginia resident who, prior to the events giving rise to this action, worked as a sales trainer for Lexus Motorcars and as a consultant for Mercedes–Benz. Defendant Volkswagen of America is a New Jersey corporation, with offices in Troy, Michigan, that supplies Volkswagen automobiles to retail dealerships across the United States. In addition, Volkswagen assigns manufacturer's representatives to work on the premises of local retail dealerships. Defendant Peak is a Pennsylvania corporation, also with offices in Troy, Michigan, that provides employees to client corporations pursuant service contracts. Pursuant to a service contract with Volkswagen, Peak provides employees for Volkswagen's field marketing specialist and manufacturer's representatives program. Defendant Fairfax, a retail automobile dealership located in Fairfax, Virginia, sells Volkswagens and other imported automobiles. Defendant Richard Blaylock was employed as the general manager of Fairfax Volkswagen during the time period that Magnuson worked on the premises as a manufacturer's representative.

Plaintiff's relationship with the defendants began in July of 1990, when Magnuson interviewed with Frank Macguire, the National Retail Marketing Manager for Volkswagen. At this interview, Macguire informed Magnuson that he would recommend her for employment as a Volkswagen field marketing specialist, and that she would soon be contacted by a representative of Peak. Magnuson never interviewed with a Peak employee for this position. Several days after her interview with Macguire, Donald Barr, a representative from Peak, called Magnuson to offer her a position as a field marketing specialist, which she accepted.

Magnuson received her job training directly from Volkswagen in the summer of 1990. Following this training, she was assigned to work with Volkswagen dealerships in Virginia, Maryland, and the District of Columbia. Magnuson's job duties required her to visit approximately eight dealerships each week to monitor their sales and marketing of Volkswagen automobiles. Magnuson's understanding of her employment arrangement was that she would receive her salary and benefits from Peak, but that her work would relate solely to the marketing and sales of Volkswagen automobiles. Moreover, Magnuson understood that Volkswagen would continue to provide direct training and supervision. Magnuson worked as a field marketing spe-

statement and motion to dismiss, as well as defendant Fairfax's motion to dismiss. The Court denied defendant Blaylock's motion for a more definite statement, but granted defendants Blaylock's and Fairfax's motions to dismiss Counts II, III, and V. The Court denied the defendants' motions to dismiss Counts I and IV.

Thereafter, oral argument was heard on defendants Peak's and Volkswagen's motions to dismiss, or, in the alternative, for summary judgment. Following argument, the Court dismissed Counts II, IV, and V and took Counts I and III under advisement as to these defendants.

cialist from the late summer to the winter of 1990.

In or about December of 1990, Volkswagen established its manufacturer's representative program. This newly instituted program was apparently intended by Volkswagen to bolster sales of its automobiles by stationing Volkswagen-trained representatives at local dealerships. These representatives were to provide more detailed technical knowledge of the automobiles, help in sales training, and provide assistance in demonstrating the various features of Volkswagen automobiles. John Swisher of Volkswagen, plaintiff's direct supervisor at that time, informed her that she had excellent public relations skills and was one of the top candidates for a position in the manufacturer's representative program. A month later, Swisher, who was made manager of this new program, offered her a job as a manufacturer's representative. Magnuson accepted and began work at her assigned dealership, Fairfax Volkswagen. In addition to recording market observations for Volkswagen of America, Magnuson's duties at the dealership included assisting Fairfax in special promotional campaigns, providing demonstrations of vehicles, and taking potential buyers on test drives. Magnuson apparently participated in all aspects of the sale of a Volkswagen up to, but not including, processing the documents and paperwork associated with closing the deal.

From the beginning of the year to May of 1991, Magnuson's supervisor, Dave Parsons of Peak, gave her very favorable evaluations. In May, defendant Richard Blaylock, became the new general manager at Fairfax. On May 15, Blaylock met with Magnuson, Magnuson's new supervisor, Kathi Tennant, and another person that Magnuson was training to become a manufacturer's representative. At this meeting, Blaylock presented his views on Magnuson's duties and responsibilities at Fairfax. According to Magnuson, these differed with those provided by Volkswagen and Peak. In addition, Blaylock stated that Magnuson was an asset to the dealership, and that he would personally hire her if Peak or Volkswagen attempted to move her from Fairfax Volkswagen.

Shortly thereafter, Blaylock began making sexual advances towards Magnuson. He insisted that Magnuson meet with him in his office with the door closed, and he would insist that she sit in a chair next to him rather than across from him. On various occasions, Blaylock put his hand on Magnuson's leg and attempted to pull her closer to him. On these occasions, Magnuson removed Blaylock's hand and tried to move her chair away, but Blaylock pulled the chair back. During her tenure at Fairfax, Blaylock harassed Magnuson on a regular basis by making lewd and offensive comments to her concerning her body. According to Magnuson, Blaylock commented on several occasions that Magnuson "looked so good" that he needed to "go back into the restroom" to relieve himself sexually.

Nor was this the extent of the objectionable conduct. Beyond these events, Magnuson described a wide range of sexually harassing conduct. She claims that Blaylock repeatedly referred to her as "sweetheart," "hon," and his "Fahrvergnugen girl," despite her requests that he stop doing so. On two separate occasions during Magnuson's employment at Fairfax, women were hired to strip and dance naked in the basement of the dealership. Following one of these occasions, Blaylock, in a conversation with Magnuson, compared her anatomy with that of one of the strippers. At several sales meetings, Blaylock also requested that she leave the room so that the men present could discuss sex. In addition, Blaylock asked Magnuson on three separate occasions to leave work in the middle of the day and check into a hotel room with him, presumably to have sex. Magnuson refused Blaylock's advances on every occasion and asked him to stop his behavior. Blaylock's response on one occasion, according to Magnuson, was to threaten her career; he reportedly told her he told her that he could make or break her career based on his reports to Peak and Volkswagen of her work performance.

Magnuson contacted her supervisors at Peak and Volkswagen and notified them of Blaylock's harassment. She asked to be assigned to another dealership because Blaylock made it difficult to perform her work. Surprisingly, her supervisor, Kathi Tennant, told her that she should "put up with it for the sake of Volkswagen." Tennant also told Magnuson that this harassment was normal, given the male-dominated nature of the automotive sales business. Although Tennant promised that she would set up a meeting with Blaylock, no such meeting was ever arranged. Magnuson also called John Swisher, the Volkswagen manager in charge of the manufacturer's representative program, to complain about Blaylock's behavior. Again, no corrective measures were taken to remedy the situation.

On May 27, Blaylock summoned Magnuson to a meeting and told her that he had been bothered by the flat shoes she had worn the previous Saturday. He stated that her legs were very "sexy," and that he did not want her to wear flat-heeled shoes again. The next day, Blaylock and Joseph Bentz, the district sales manager for Volkswagen, returned to the dealership in an intoxicated state after dinner. Once there, they repeatedly harassed Magnuson, discussing her anatomy and making sexual comments of a crass and vulgar nature. Blaylock and Bentz further suggested that Magnuson join both of them in a hotel room for sex as a "threesome." According to Magnuson, she had remained at the dealership later than her scheduled hours that evening because Blaylock had insisted that she stay late to deliver a new car to a customer. Magnuson claims this request was as a pretext to provide Blaylock with an opportunity to harass her in the absence of other Fairfax employees.

In mid-June, Blaylock called Kathi Tennant, Magnuson's supervisor at Peak, to insist that Magnuson be removed from the Fairfax dealership. According to Magnuson, Blaylock falsely represented that she had been working insufficient hours and was a "prima donna" and a "bad apple." Magnuson alleges that Blaylock had previously complained to Tennant that she dressed in an unprofessional manner. Magnuson was subsequently removed from Fairfax Volkswagen and assigned to assist manufacturer's representatives at other dealerships. On June 27, Scott Baker, an employee of Peak called Magnuson at the dealership where she had been temporarily relocated. He told her that she no longer "fit the profile" of what Volkswagen sought in a manufacturer's representative, and that her employment would be terminated. Magnuson immediately called John Swisher at Volkswagen's offices in Troy, Michigan. Swisher told Magnuson that she was "too cute" for the position, and that the same type of harassment situation would arise if she were to be relocated to a new dealership.

Magnuson subsequently filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on December 23 alleging Title VII violations on the part of Peak and Volkswagen. On March 24, 1992, Magnuson received a Notice of the Right to Sue letter from the EEOC. This lawsuit followed.

## III.

## TITLE VII CLAIMS

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of sex with respect to "compensation, terms, conditions or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). In the present case, Magnuson alleges the following Title VII claims: (i) sexual harassment based on a hostile environment; (ii) discriminatory discharge; and (iii) retaliation. In order for plaintiff to pursue these claims, genuine issues of material fact must exist with respect to each of these claims.[2]

---

**2.** Summary judgment is appropriate only if no genuine issue of fact exists and the Court concludes that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). In deciding whether to grant summary judgment, the Court may consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits...." *Id.* The moving party bears the initial burden of proving that no material facts are

## A. "EMPLOYER" STATUS UNDER TITLE VII

■ Analysis properly begins with the threshold determination of whether each of the four defendants can be held liable as an "employer" for purposes of Title VII. In order to be subject to liability under Title VII, a defendant must (1) fall within Title VII's statutory definition of "employer," and (2) have exercised substantial control over significant aspects of the compensation, terms, conditions, or privileges of plaintiff's employment. *See Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 611 F.Supp. 344 (S.D.N.Y.1984) (holding that most important factor in determining "employer" status under Title VII is the "extent of employer's right to control means and manner of worker's performance).

Title VII defines the term "employer" to include "a person engaged in industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year and any agent of such person...." 42 U.S.C. § 2000e(b). All of the defendants fall within the scope of this statutory definition: defendants Peak, Volkswagen and Fairfax employ fifteen *or* more employees for the requisite time period and it is undisputed that defendant Blaylock is an agent of Fairfax, his direct employer.

■ The conclusion that all of the defendants satisfy the statutory definition of "employer" does not end the inquiry. Yet to be determined is whether all of the defendants are plaintiff's employer for Title VII purposes. Put another way, the question is whether any or all of the defendant's have a relationship with plaintiff whereby they exercise the requisite control over her employment situation so as to be deemed *her* employer under Title VII. Most Title VII cases involve the conventional single employer situation and the typical employer-employee relationship,

where this control is obvious. Not surprisingly, therefore, the precise nature and extent of the control necessary to qualify a defendant as an "employer" for Title VII purposes has not been clearly defined. What seems clear, however, is that, contrary to defendant's arguments, Title VII liability *does not* apply solely to conventional single employer situations. Title VII's plain language reflects this. Thus, Section 703(a)(1) of Title VII provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or discharge *any individual,* or otherwise discriminate against *any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. 2000e–2(a)(1) (emphasis added). By using the term "individual," Congress left open the possibility that Title VII might apply beyond the conventional single employer situation. Similarly, in providing for a private right of action, Title VII does not refer to an "employee," but to "the person aggrieved." 42 U.S.C. § 2000e–5(f)(1). This term has been construed "as comprehending individuals who do not stand in direct employment relationship with an employer." *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1341 (D.C.Cir.1973); *see also Spirt v. Teachers Insurance and Annuity Associates,* 691 F.2d 1054, 1063 (2d Cir.1982), *vacated and remanded on other grounds* 463 U.S. 1223, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 611 F.Supp. 344 (S.D.N.Y.1984); *Puntolillo v. New Hampshire Racing Commission,* 375 F.Supp. 1089 (D.N.H.1974).

As the sparse authority reflects, the term "employer" under Title VII should be "construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an individual's com-

in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party must produce evidence that shows there exists a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

**508**

pensation, terms, conditions, or privileges of employment". *Bostick v. Rappleyea*, 629 F.Supp. 1328, 1334 (N.D.N.Y.1985) (quoting *Spirt v. Teachers Insurance and Annuity Associates*, 475 F.Supp. 1298, 1308 (S.D.N.Y.1979), *aff'd in part and rev'd in part on other grounds*, 691 F.2d 1054 (2d Cir.1982), *vacated and remanded on other grounds*, 463 U.S. 1223, 103 S.Ct. 3566, 77 L.Ed.2d 1406 (1983)). This conclusion finds support in the broad, remedial purpose of Title VII which militates against the adoption of a rigid rule strictly limiting "employer" status under Title VII to an individual's direct or single employer.[3]

■ Most Title VII lawsuits, as noted above, typically present a scenario where an employee-plaintiff maintains a cause of action against her single, contractual employer. But this case is not so straightforward. Magnuson's employment situation is more complicated because there does not seem to be just a single employer. Rather, each of the defendants in this case appears to have exercised some amount of control over her employment as a manufacturer's representative. An individual may be the employee of more than one "employer" for purposes of Title VII. *See, e.g., Amarnare*, 611 F.Supp. at 349. As a result, Magnuson's relationship to each defendant must be examined in order to ascertain whether that defendant may be held liable as Magnuson's "employer" because it exercised the requisite control over the compensation, terms, conditions or privileges of her employment.

### 1. *Peak*

■ None of the parties dispute that Peak is plaintiff's employer for purposes of Title VII. Magnuson received her paychecks and benefits from Peak, entered into a written employment agreement with Peak, and reported to supervisors at Peak. Magnuson and Peak clearly had the type of direct employer-employee relationship that is typically the subject of Title VII law-

suits. As such, Peak would be independently liable as an "employer" if Magnuson can establish Title VII violations attributable to Peak. More difficult is determining whether any of the remaining three defendants may be Magnuson's employers under Title VII absent a similarly direct contractual employment relationship.

### 2. *Volkswagen of America*

■ No contractual employment relationship existed between Magnuson and Volkswagen. It appears, however, that Volkswagen exercised significant control over the terms and conditions of Magnuson's employment as a manufacturer's representative. Documentary evidence supports Magnuson's claims that Volkswagen either controlled or had substantial influence over critical personnel decisions relating to her employment. According to Magnuson, a Volkswagen employee interviewed her initially for the position as a marketing field specialist and directed Peak to hire her for this job. A Volkswagen supervisor subsequently informed her of the manufacturer's representative program, and Volkswagen made the decision to promote her to a position in the program. In addition, a genuine issue of material fact exists as to whether Volkswagen actually made the final decision to terminate Magnuson's employment.

The record also supports Magnuson's claims that Volkswagen exercised control over her actual work performance. Volkswagen apparently defined many of Magnuson's job duties and responsibilities, provided all of her initial job training, sent her additional training materials on a weekly basis, and received reports on her work performance. Magnuson also appears to have been under the supervision of a Volkswagen manager, John Swisher. Indeed, the terms of Magnuson's written contract provide that Volkswagen, as the "client," would retain some measure of

---

**3.** Congress intended that Title VII proscribe employment discrimination "in the broadest possible terms" and, accordingly, it "should be accorded a liberal interpretation in order to effectuate the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of [employment] discrimination." *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

control over Magnuson's employment situation. While this contract provides that Peak would pay Magnuson's salary, it states that Magnuson i) would adhere to the client's normal work schedule; ii) have a client supervisor sign a weekly timeslip; and iii) report to both her client supervisor and a Peak supervisor if she missed work for any reason. Thus, since a fact-finder could conclude that Volkswagen retained control over Magnuson's employment as a manufacturer's representative, Volkswagen may be treated as Magnuson's "joint employer" for purposes of Title VII. *See Amarnare*, 611 F.Supp. 344 (S.D.N.Y. 1984) (holding that temporary services agency *and* company that contracted with temporary services agency both to be "employers" of a temporary employee for purposes of Title VII); *cf. Maynard v. Kenova Chem. Co.*, 626 F.2d 359 (4th Cir.1980) (holding under "loaned servant" doctrine that temporary employee may be special employer's employee for purposes of state worker's compensation law); *Beaver v. Ja-*

*cuzzi Bros., Inc.*, 454 F.2d 284, 285 (8th Cir.1972) (per curiam).

Particularly instructive is *Amarnare.* There the court held that a temporary services agency and the company that had contracted with the agency for temporary assistance were both joint "employers" of the temporary employee for purposes of Title VII. In reaching this conclusion, the court analyzed the "economic realities of the situation viewed in light of the common law principles of agency and the right of the employer to control the employee," and held that "the extent of the employer's right to control the means and manner of the worker's performance is the most important factor." *Id.* at 347–48 (citations omitted). In that case, plaintiff had been assigned to work at Merrill Lynch for two weeks, where she was under the direct supervision of Merrill Lynch employees. The court found that Merrill Lynch had "complete" control over plaintiff's work assignments, the means and manner of her performance and the hours of her employment.[4]

---

**4.** Also supportive are cases arising under the National Labor Relations Act, in which courts have specifically articulated various tests for determining "joint employer" status. The Fourth Circuit's decision in *N.L.R.B. v. Gibraltar Industries, Inc.*, 307 F.2d 428 (4th Cir.1962) set forth a five part test for determining whether two entities constituted a joint employer. The court held that the test was whether the two entities had: (1) present unity of interest; (2) common control; (3) dependent operation; (4) sameness in the character of work; and (5) unity of labor relations. In a subsequent decision, the Fourth Circuit held that the question of whether or not two businesses could be considered "joint employers" is simply a question of "whether [one employer] possessed *sufficient indicia* of control over the work employees of [the second employer]." *N.L.R.B. v. Jewell Smokeless Coal Corp.*, 435 F.2d 1270, 1271 (4th Cir. 1970) (per curiam) (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964)) (emphasis added). In addition, the Third Circuit has held that, in making a determination as to "joint employer" status, the courts should look to whether:

one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.

\* \* \* \* \* \*

Thus, the "joint employer" concept recognizes that the business entities involved are in fact

separate but that they *share or co-determine* those matters governing the essential terms and conditions of employment.

*N.L.R.B. v. Browning–Ferris Industries, Inc.*, 691 F.2d 1117, 1123 (3rd Cir.1982) (citations omitted). In that case, the court specifically considered the retention of one employer's rights over the other employer's employees, including the rights (i) to hire and fire; (ii) to establish work hours; (ii) provide employees with uniforms; and (iv) to determine the employees' compensation. *Id.* at 1124–25.

The "joint employer" concept, contrary to defendants' arguments, does not depend on the existence of a single, integrated enterprise. Rather, "a finding that companies are 'joint employers' assumes in the first instance that companies are 'what they appear to be'—independent legal entities that have merely 'historically chosen to handle jointly ... important aspects of their employer-employee relationship.'" *N.L.R.B. v. Browning–Ferris Industries*, 691 F.2d 1117, 1122 (3rd Cir.1982) (citing *N.L.R.B. v. Checker Cab Co.*, 367 F.2d 692, 698 (6th Cir. 1966)).

Accordingly the Court rejects defendant's contention that Magnuson must prove that all of the defendants constituted a "single employer" in keeping with the four-part test articulated in *Baker v. Stuart Broadcasting Co.*, 560 F.2d 389 (8th Cir.1977) in order to pursue her Title VII claims. In that case, the court held that two entities could be considered together as a "single employer" under Title VII where one of the

■ No one factor is determinative in ascertaining whether a defendant is a "joint employer" under Title VII. Consideration of all of the circumstances surrounding the work relationship is essential, with greatest emphasis placed on the extent of the employer's right to control the manner and means of the worker's performance. As such, the proper inquiry is whether, given the facts of a particular case, the company that contracted with another for the services of the aggrieved individual actually exercised substantial control over the terms and conditions of her employment. Thus, while Magnuson needs to establish more clearly the nature and scope of Volkswagen's control, she has raised a genuine issue as to whether Volkswagen is an employer of hers for purposes of Title VII.

### 3. Fairfax Volkswagen

■ Fairfax, like Volkswagen does not have a direct employer-employee relationship with Magnuson. The realities of Magnuson's position as a manufacturer's representative, however, arguably brought her under Fairfax's control as a *de facto* employee. Magnuson's job duties and responsibilities required her to work on the premises of Fairfax Volkswagen, work with Fairfax personnel, attend sales meetings, and to submit to the apparent authority of Fairfax's general manager, Richard Blaylock. The record reflects that Magnuson may have also been under the supervision of Fairfax's Volkswagen floor sales manager. Evidence in the record suggests that this Fairfax employee monitored Magnuson's hours and reported back to Magnuson's supervisors. Furthermore, Magnuson's duties included talking with customers, taking them on test drives, and all aspects of selling vehicles except for actually closing the deal and processing the final papers. Given Fairfax's control over these aspects of Magnuson's duties, a gen-

uine issue of material fact exists concerning the extent, if any, of its control over the terms and conditions of Magnuson's employment. If it is established at trial that Fairfax exercised substantial control over Magnuson's work performance, then it may be held independently liable as an "employer" for purposes of Title VII.

No evidence exists in the record to suggest that Fairfax entered into a formal contract with Volkswagen or Peak relating to the shared control over Magnuson's employment situation. Yet the record reflects that there existed some understanding with respect to Magnuson's presence at Fairfax. The management at Fairfax permitted Magnuson to work on its premises and provided her office space. Indeed, Fairfax obviously retained some influence over whether Magnuson remained at the dealership. That defendant Blaylock's complaints arguably led to Magnuson's removal from Fairfax is indicative of such influence. Thus, whether Fairfax can be considered a "joint employer" with Peak and/or Volkswagen insofar as it shared control over Magnuson's work performance is a disputed factual matter to be resolved at trial.

Fairfax may also be held to be a proper defendant in this case if Volkswagen of America is Magnuson's employer under Title VII *and* an agency relationship is established between Volkswagen and Fairfax. *See* 42 U.S.C. § 2000e(b) (definition of "employer" includes "agent" of statutory Title VII employer). No evidence in the record suggests, however, that Fairfax acted as Volkswagen's agent. To be sure, Fairfax's status as a retailer of Volkswagen automobiles required it to maintain close relations with Volkswagen, but Magnuson has not provided any evidence sufficient to support the existence of an agency relationship relating to employment matters.

companies did not meet the statutory definition of "employer." The *Baker* court, adopting the approach used in NLRA cases, held that there were four criteria for determining whether the consolidation of separate entities is proper: 1) interrelations of operation; 2) common man-

agement; 3) centralized control; and 4) common ownership. *Id.* at 392. This test is not applicable here because all defendants *independently* may be Magnuson's employers for purposes of Title VII.

#### 4. Richard Blaylock

■ Blaylock's potential liability as an employer for purposes of Title VII necessarily depends on whether Magnuson establishes that Fairfax is her employer under Title VII. An employee of a Title VII employer may be liable himself if, as the employer's agent, he exercised supervisory authority over the alleged victim. *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989). A genuine issue of fact exists here as to Blaylock's exercise of authority over Magnuson. Evidence in the record supports Magnuson's claim that she submitted to Blaylock's supervisory authority. According to Magnuson, at Blaylock's direction, she planned a dealership party and performed other duties outside of those normally performed by manufacturer's representatives. Furthermore, Blaylock apparently disagreed with both Magnuson and her Peak supervisor, Kathi Tennant, concerning Magnuson's duties and responsibilities at the dealership. Blaylock clearly attempted to exert authority over Magnuson. While Blaylock did not have the power to fire Magnuson, he did complain about her to her supervisor at Peak and apparently had some influence on the decision to remove her from the dealership and subsequently to terminate her from the manufacturer's representative program. *See Paroline*, 879 F.2d at 104 ("The supervisory employee need not have ultimate authority to hire or fire to qualify as an employer as long as he or she has significant input into such personnel decisions"); *see also Jeter v. Boswell*, 554 F.Supp. 946, 952–953 (N.D.W.Va.1983) (denying summary judgment in race discrimination case where plaintiff alleged that plant manager exercised responsibility over personnel decisions).[5] Indeed, so long as Blaylock exerted authority and as a supervisor over the terms and conditions of Magnuson's employment, he may be an employer of hers under Title VII. Thus, while the extent of this control and authority is unclear and requires further development at trial, Magnuson has raised a triable issue of fact that Blaylock acted as her supervisor.

In sum, genuine issues of material fact exist concerning each defendants' status as an employer of Magnuson's for purposes of Title VII. Assuming that Magnuson can succeed in establishing that each defendant is an employer of hers under Title VII, the next question is whether any of the defendants are entitled to summary judgment on Magnuson's specific Title VII claims.

#### B. SEXUAL HARASSMENT CLAIM

■ Sexual harassment in the workplace constitutes sex discrimination and violates the provisions of Title VII.[6] The courts have recognized two basic types of sexual harassment as giving rise to claims under Title VII: (1) *quid pro quo* harassment; and (2) harassment arising from a hostile work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *accord Katz v. Dole*, 709 F.2d 251, 254–55 (4th Cir.1983). *Quid pro quo* sexual harassment occurs when a supervisor demands sexual consideration in exchange for job benefits. *Katz*, 709 F.2d at 254. Unlike *quid pro quo* harassment, hostile work environment harassment is not linked to the grant or denial of tangible job benefits. Rather, hostile work environment sexual

---

5. Blaylock asserts that he could not have been Magnuson's supervisor because her Peak supervisor, Kathi Tennant, told her to ignore Blaylock's attempts to assert such authority. But the proper inquiry is not whether Blaylock's alleged attempts to assert control over Magnuson's attempt were legitimate: rather, the focus should be whether Blaylock, in fact, exercised such supervisory authority.

6. The "EEOC Guidelines on Sexual Harassment" define "sexual harassment" as follows:
Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.
29 C.F.R. § 1604.11(a) (1991)

harassment involves conduct which unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment. *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. at 2404–05.

■ Magnuson's sexual harassment claim is one for hostile work environment.[7] To prove that sexual harassment created a hostile or offensive atmosphere, Magnuson must show that: (1) she belongs to a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) there is some basis for imputing liability to the employer. *Swentek v. USAir, Inc.,* 830 F.2d 552 (4th Cir.1987); *Henson v. Dundee,* 682 F.2d 897, 903–04 (11th Cir.1982).

Review of the record reveals that Magnuson has raised genuine issues of material fact relating to the first four elements of proof for a hostile environment claim. First, Magnuson, as a woman, is clearly a member of a protected class. Second, the record supports Magnuson's claims that Blaylock's comments and actions made her uncomfortable, embarrassed, and were not welcome. Third, the record reveals that Blaylock's harassment was sexual in nature. Fourth, the record further supports Magnuson claims that this harassment unreasonably interfered with her work performance and created an offensive working environment. None of the defendants have met their burden on summary judgment of proving that no material facts are in dispute. Instead, the facts concerning these four elements are sharply disputed by the parties and must be resolved at trial.

■ The material facts relating to the fifth element are also disputed, but this element must be examined in greater detail in order to ascertain whether, as a matter of law, each defendant can be held responsible for the sexual harassment of Magnuson. *See Katz,* 709 F.2d at 255 (once plaintiff proves harassment took place, "the most difficult legal question typically will

concern the responsibility of the employer for that harassment"). A clear basis, of course, exists for imposing liability on Blaylock himself should it be established that he exercised sufficient supervisory authority over Magnuson to be deemed her employer under Title VII, and that his actions created a hostile or offensive working environment for Magnuson. Blaylock is obviously directly liable for his own actions. *See Paroline,* 879 F.2d at 106 (supervisor deemed to be an "employer" under Title VII directly liable for sexual harassment of coworker); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1557–58 (11th Cir.1987). But even assuming that the remaining defendants are Magnuson's Title VII employers, questions remain concerning the legal basis for holding these defendants liable for the hostile environment created by Blaylock's actions.

■ Since neither Peak nor Volkswagen have a direct employment relationship with Blaylock, whether they should be held responsible for Blaylock's sexual harassment of Magnuson raises a novel question: can "employers" of an aggrieved individual under Title VII be held liable for sexual harassment acts of nonemployees? This is a question of first impression for this circuit. This Court, however, is not without guidance in resolving this issue. The "EEOC Guidelines on Sex Discrimination" state:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

29 C.F.R. § 1604.11(e). While the EEOC Guidelines are intra-agency guidelines not

---

7. In her memoranda, Magnuson contends she also has alleged a *quid pro quo* claim. Close scrutiny of her amended complaint contradicts this contention.

binding on federal courts, they are nevertheless entitled to deference in the courts.[8] In addition, the EEOC has rendered an administrative decision holding an employer liable for the sexual harassment of one of its employees by an nonemployee. *See EEOC Dec. 84–3,* 34 Fair Empl.Prac.Cas. (BNA) 1887 (1984).[9]

In that case, the EEOC held the owner of a restaurant liable under Title VII for the sexual harassment of a waitress by a regular customer. In doing so, the EEOC applied the EEOC Guideline set forth at 29 C.F.R. § 1604.11(e) and declared that an employer may be held liable for the harassing actions of a nonemployee "where the employer fails to take corrective measures within its control once it knows or has reason to know of the non-employee's conduct." *Id.* at 1890–91. The harasser in this case was a frequent and regular customer who had a social relationship with the employer. As such, the EEOC concluded that the employer had some measure of control over the nonemployee, and "was in an especially advantageous position to address the Charging Party's specific complaints." *Id.* at 1889. The EEOC declared that the employer could have taken at least two appropriate corrective measures following the waitress's complaints about the customer: (i) informing the customer that further harassment would not be tolerated; and (ii) relieving the waitress, as she requested, of the duty to wait on the customer in the future. Since the employer did not follow either course of action, the EEOC held him liable under Title VII.[10]

A similar analysis obtains in this case with respect to the liability of Peak and Volkswagen for Blaylock's actions. Peak and Volkswagen may be held liable for Blaylock's harassment of Magnuson if i) they knew of the harassment; and ii) failed to take any corrective actions to remedy the situation. Whether Peak and Volkswagen knew of Blaylock's harassment is a sharply disputed issue, but Magnuson's claim that she informed her supervisors at Peak and Volkswagen is supported by affidavit and other documentary evidence. It appears undisputed, however, that Peak and Volkswagen took no corrective actions to deal with Blaylock's harassment of Magnuson.

Fairfax's liability for Blaylock's actions also depends on whether it had knowledge of Blaylock's harassment and failed to take appropriate measures to remedy the situation. Unlike Peak or Volkswagen, Fairfax is Blaylock's direct employer and clearly has authority over, and responsibility for, his actions. The standard for assessing an employer's liability in a hostile environment case for the harassing actions of an employee is well settled in this circuit. *Katz v. Dole,* 709 F.2d 251, 255 (4th Cir.1983), holds that "plaintiff must demonstrate that the employer had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action (citations omitted)." *Katz,* 709 F.2d at 255. Magnuson may prove knowledge on the part of Fairfax by proving that complaints were lodged against Fairfax or that the harassment was so pervasive that em-

---

**8.** The courts have, in fact, recognized and adopted the EEOC Guidelines, or portions thereof, in several sexual harassment cases. *See e.g., Meritor Savings Bank,* 477 U.S. at 57, 106 S.Ct. at 2399; *Horn v. Duke Homes, Inc.,* 755 F.2d 599 (7th Cir.1985) (court adopts EEOC strict liability guideline); *Vinson v. Taylor,* 753 F.2d 141 (D.C.Cir.1985) (court attaches great weight to EEOC Guidelines), *aff'd sub nom. Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981).

**9.** One federal court also held an employer liable for requiring a building lobby attendant to wear a sexually provocative uniform where it knew that this would subject the employee to sexual harassment by the public and building tenants. *EEOC v. Sage Realty Corp.,* 507 F.Supp. 599 (S.D.N.Y.1981).

**10.** Although the EEOC did not specifically hold as such, the facts of this case render it a hostile environment harassment case. No *quid pro quo* harassment could be involved here because the nonemployee was not in the position to grant or deny tangible job benefits. Instead, the employer's acquiescence to, and refusal to take measures to correct, the customer's harassment of the waitress clearly gave rise to an abusive and hostile working environment.

ployer awareness may be inferred. Although here, there is no allegation that Magnuson complained directly to Fairfax, there is a disputed question of fact with respect to the pervasiveness of the harassment.

Next, Magnuson alleges that her employment as a manufacturer's representative was terminated because she was a woman. As established above, Title VII prohibits employers from firing an individual because of her sex. *See* 42 U.S.C. § 2000e–2(a)(1). In order for her to pursue this claim, Magnuson must show by a preponderance of the evidence: (1) her membership within a protected class; (2) her discharge and/or denial of promotion; (3) her replacement with or promotion of a person outside the protected group; and (4) her ability to do the job or her qualification for the promotion. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Magnuson can establish that she is a member of a protected class, that she was fired, and that she had the qualifications to perform her duty as a manufacturer's representative. But she has not alleged, nor does the record reflect, that she was replaced by a man. Yet a plaintiff may nonetheless establish a prima facie case without proving that she was so replaced "whenever the plaintiff has presented evidence which creates an inference that she was terminated for reasons prohibited by Title VII." *Delgado v. Lehman*, 665 F.Supp. 460 (E.D.Va.1987) (*citing International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).[11] Here, there is evidence in the record to suggest that Magnuson was, in fact, discharged because of her sex. To be sure, her amended complaint focuses primarily on the hostile environment claim. But the comments that were made after her discharge that she was "too cute" for the job raise the inference that she, as a woman, was discharged because of her inherent vulnerability to sexual harassment. Indeed, Magnuson alleges that John Swisher of Volkswagen told her that if she were placed in another dealership, she would be once again harassed. It also appears that Kathi Tennant of Peak had repeatedly expressed doubts as to the wisdom of placing women in male-dominated local dealerships. As a result, Magnuson's claim of discriminatory discharge survives summary judgment.

Although defendants Blaylock and Fairfax did not have the actual authority to terminate plaintiff's employment, they may also be held liable. Courts have recognized a cause of action under Title VII for interference with potential employment opportunities. *See e.g., Pardazi v. Cullman Medical Center*, 838 F.2d 1155 (11th Cir.1988); *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291 (11th Cir.1988); *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir.1983); *Amarnare*, 611 F.Supp. at 349 (1984). As such, if Magnuson can establish that Blaylock's and Fairfax's discriminatory actions caused her to be fired, then these defendants may also be held liable for her discharge. Blaylock's harassment and Magnuson's subsequent opposition to his actions clearly raise a disputed issue of material fact relating to the existence of a discriminatory motive on the part of Blaylock and Fairfax.

## C. RETALIATION CLAIM

Closely associated with Magnuson's claim of discriminatory discharge is her claim that Peak and/or Volkswagen terminated her in retaliation for her opposition to Blaylock's sexual harassment.[12]

---

**11.** The *International Brotherhood of Teamsters* court stated:

The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

431 U.S. at 358, 97 S.Ct. at 1866.

**12.** Contrary to defendant's contention, Magnuson has exhausted her administrative remedies with respect to this claim. Although defendants argue that Magnuson's EEOC complaint does not specifically mention "retaliation," this claim

Section 704(a) of Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliatory discharge, a plaintiff must allege and prove: (1) that she participated in a Title VII proceeding or opposed a practice made unlawful by Title VII; (2) that the employer knew of the employee's participation or opposition; (3) that the employee suffered adverse employment treatment following the participation or opposition; and (4) a causal connection between the adverse employment treatment and the participation or opposition. *Blizzard v. Newport News Redevelopment & Housing Authority*, 670 F.Supp. 1337, 1343 (E.D.Va.1984) (citing *Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir.1982)).

██ Genuinely disputed issues of material fact exist with respect to each of these elements. Magnuson alleges that she objected to Blaylock's sexual advances, complained to her supervisors at Peak and Volkswagen concerning this behavior, and that she was fired as a result.[13] Opposition to sexual harassment is protected from retaliation by an employer. *See EEOC Dec. 84–3*, 34 Fair Empl.Prac.Cas. (BNA) 1887 (1984) (termination for opposition to sexual harassment by customer and contacting attorney constituted retaliation); *Barrett v. Omaha National Bank*, 584 F.Supp. 22 (D.Neb.1983), *aff'd*, 726 F.2d 424 (8th Cir. 1984) (complaint by loan officer to bank vice president deemed to constitute protected opposition to unlawful employment practice). Here, it is undisputed that Magnuson's employment as a manufacturer's representative was terminated. Not surprisingly, however, defendants Peak and Volkswagen hotly dispute Magnuson's allegations that they were made aware of Blaylock's sexual harassment. Moreover, all of the defendants dispute that any causal relationship exists between her opposition to Blaylock's harassment and her termination. Given these factual disputes, this claim must be resolved at trial.

## IV.

## STATE LAW CLAIMS

██ Magnuson's two remaining state law claims include (1) a claim against defendants Volkswagen and Peak for breach of contract; and (2) a claim against defendants Fairfax and Blaylock for tortious interference with contract. This court has pendent jurisdiction over these claims because they arise from a "common nucleus of operative fact" with Magnuson's Title VII claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

### A. BREACH OF CONTRACT (Count III)

Magnuson alleges that "Volkswagen/Peak" breached their contract to employ her through December of 1991 and to renew her contract upon satisfactory performance and in the event Volkswagen

---

falls under the scope of the EEOC investigation which could "reasonably be expected to grow out of the charge of discrimination." *See Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970). As a general proposition, "it is well established that the scope of the EEOC complaint should not be strictly interpreted." *Id.* at 465. In this case, Magnuson alleged that she had been fired because of her refusal to accede to Blaylock's advances. Accordingly, review of Magnuson's EEOC complaint reveals that any subsequent investigation reasonably would have included inquiry into retaliation. As such, Magnuson exhausted her administra-

tive remedies when the EEOC issued her a Notice of the Right to Sue. *See e.g., Scott v. Overland Park*, 595 F.Supp. 520 (D.Kan.1984) (failure to use term "retaliation" in EEOC charge does not bar its litigation in Title VII failure to promote case).

13. Under the EEOC's Guidelines, an employee's opposition to any unlawful employment practice, whether of her own employer, or of some other employer, is protected. EEOC Compliance Manual, 704(a) Discrimination, § 492.2(e).

decided to continue funding the manufacturer's representative program. Fairly read, the amended complaint appears to allege the existence of two contracts: (i) Magnuson's written employment contract with Peak; and (ii) some form of an oral employment contract with Volkswagen.

Under Virginia common law, an employment contract that contains no fixed duration is terminable at will, given reasonable notice to the other party. *Miller v. SEVAMP*, 234 Va. 462, 362 S.E.2d 915, 917 (1987). With respect to Magnuson's contract with Peak, neither the writing nor any evidence in the record reflects that Peak and Magnuson had agreed to a fixed term of employment. As a result, Magnuson's employment was terminable at will. Thus, Peak's discharge of Magnuson, given with notice, could not constitute a breach of contract. .

Nor does any public policy exception apply here, since Virginia recognizes a "narrow exception to the employment at-will rule" that is limited to discharges that implicate the public welfare in general. Magnuson's breach of contract claim essentially represents a state cause of action for retaliatory discharge. No generalized cause of action for retaliatory discharge has been recognized in Virginia. *SEVAMP*, 362 S.E.2d at 918. Indeed, the General Assembly has enacted statutes which permit such actions in precisely defined circumstances. *See e.g.*, Va.Code §§ 51.01–41 and 51.01–46 (employment discrimination against persons with disabilities); Code §§ 40.1–51.2:1 and 40.1–51:2:2 (retaliatory discharge of employee who files safety or health complaint); Code § 65.1–40.1 (retaliatory discharge of employee who makes worker's compensation claim). As a result, Magnuson's claim that Peak breached its employment contract with her must fail.

In addition, to the extent that Magnuson alleges a breach of contract on the part of Volkswagen, this claim must also fail. Although Magnuson has alleged that a Volkswagen representative told her that she would be employed through December of 1991, Magnuson admitted in her answers to interrogatories that no common law employment relationship existed between her and Volkswagen. Volkswagen cannot be held liable for an employment contract that plaintiff concedes did not exist. As a result, summary judgment must be granted for defendants Peak and Volkswagen on Count III of the amended complaint.

### B. TORTIOUS INTERFERENCE WITH CONTRACT (Count IV)

Magnuson alleges that defendants Blaylock and Fairfax Volkswagen tortiously interfered with her employment contracts with Peak and Volkswagen. As noted above, Magnuson had no common law employment contract with Volkswagen. It is undisputed, however, that she had an at-will employment contract with Peak. In order to maintain a cause of action for tortious interference of a contract terminable at will, a plaintiff "must allege and prove not only an *intentional* interference that caused the termination of the at-will contract, but also that the defendant employed *'improper methods.'*" *Duggin v. Adams*, 234 Va. 221, 227, 360 S.E.2d 832, 836 (1987) (citing *Hechler Chevrolet v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985)). The term "improper methods" has been defined to include violence, threats or intimidations, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of fiduciary relationship. *Id.* at 227, 360 S.E.2d at 836.

In this case, Magnuson claims that Blaylock employed improper means by making false statements concerning her work performance to Peak and Volkswagen that caused her termination. While no direct evidence exists in the record concerning Blaylock's intent to interfere with Magnuson's contract, Magnuson's allegations that Blaylock's statements were false are supported by the documentary record.

Thus, Magnuson is entitled to the justifiable inference, given her objections to Blaylock's harassment, that he made such misrepresentations for the purpose of causing her termination as a manufacturer's representative. Although Magnuson may find it difficult to establish causation at trial, her claim raises genuine issues of material fact and thereby survives summary judgment.

## V.

In conclusion, the Court denies defendants' motions for summary judgment with respect to Counts I and IV and grants summary judgment for defendants Peak and Volkswagen on Count III.

An appropriate order has issued.